AMERICAN MEDICAL
ASSOCIATION, Plaintiff,

v.

UNITED STATES of America,
Defendant.

No. 82 C 7213.

United States District Court,
N.D. Illinois, E.D.

June 22, 1987.

Supplemental Opinion Sept. 2, 1987.

George A. Platz, Frank V. Battle, Jr., J. Timothy Kleespies, Sidley & Austin, for plaintiff.

Thomas R. Jones, Atty., Tax Div., Dept. of Justice, Eileen M. Marutzky, Asst. U.S. Atty., Washington, D.C., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

American Medical Association ("AMA") has sued the United States for a refund of federal income taxes imposed on AMA income earned in the years 1975 through 1978 from the sale of advertising in AMA

periodicals.[1] AMA contends the Internal Revenue Service ("IRS") denied deductions for AMA's costs of producing and distributing its periodicals that would have been allowed a commercial publisher and are therefore permitted AMA under Internal Revenue Code ("Code") §§ 511–513, 26 U.S.C. §§ 511–513.[2] Because IRS construed the Code-implementing Treasury regulations to preclude those deductions, AMA urges alternatively:

1. IRS construed the regulations erroneously.

2. If IRS construed the regulations correctly, they are inconsistent with the Code and therefore invalid.

To enable this Court to resolve those issues without a testimonial hearing, the parties have tendered a written evidentiary record[3] and trial memoranda. After full consideration of those materials, in accordance with Fed.R.Civ.P. ("Rule") 52(a) this Court sets forth the following Findings of Fact ("Findings") and Conclusions of Law ("Conclusions").[4]

*Findings of Fact*[5]

I. *Background*

A. *AMA*

1. AMA is a not-for-profit and tax-exempt federation of state medical associations formed "to promote the science and art of medicine and the betterment of public health" (Stip. ¶¶ 1–2; Stip. Ex. 1–D at 1). From 1975 through 1978 about one-half the eligible physicians in the United States were members (Stip. ¶ 2).

2. In aid of its purpose, AMA publishes various medical periodicals. Deductions for two of those periodicals, *JAMA* and the *American Medical News* ("*AM News*"), aggregate more than 95% of AMA's refund claim (AMA Mem. 4 n. *; Stip. ¶ 10). Other AMA periodicals involved in the refund claim are *Prism* (discontinued in February 1976) and a number of specialty journals: *Archives of Surgery, Archives of Dermatology, Archives of Ophthalmology, Archives of Otolaryngology* and *American*

1. AMA seeks refund of the following amounts (Stip. ¶ 8):

| | | Refund Claimed | | |
|---|---|---|---|---|
| Year | Date Claim Filed | Tax | Interest Paid | Total |
| 1975 | 12/21/81 | $1,017,542 | $407,167 | $1,424,709 |
| 1976 | 12/21/81 | 1,003,846 | 334,120 | 1,337,966 |
| 1977 | 12/21/81 | 859,218 | 179,953 | 1,039,171 |
| 1978 | 10/25/82 | 318,338 | 48,077 | 366,465 |

One of the parties' joint submissions to this Court is a proposed Final Pretrial Order ("FPTO"). FPTO 4–5 requests this Court to decide only whether AMA is entitled to a refund based on its claims, not the amount of that refund.

2. All citations to the Code will take the form "Code §—." Regulations implementing Code § 512 are codified at 26 C.F.R. 1.512(a)–1 and will be cited "Reg.—," omitting for simplicity the "§ 1.512(a)–1" beginning shared by all the cited provisions (a usage consistent with the internal language of the regulation, which speaks (for example) of "paragraph f(4)(i) of this section" when referring to Reg. § 1.512(a)–1(f)(4)(i)).

3. That record comprises a factual stipulation ("Stip.—") and attached exhibits ("Stip. Ex.—"), four trial exhibits ("Ex.—"), verified statements of certain individuals ("[Individual's name] Aff. ¶—") and deposition transcripts ("[Deponent's name] Dep.—").

4. To the extent (if any) the Findings reflect legal conclusions, they shall also be deemed Conclusions. To the extent (if any) matters later expressed as Conclusions reflect factual findings, they shall also be deemed Findings.

5. Unless otherwise indicated or clearly required by the context, all these Findings apply throughout the years 1975 through 1978. Although the parties have supplied statistical data for each of those years and as to each of the AMA periodicals involved in the refund claim, this opinion will include that data only for the year 1977 and as to the *Journal of the American Medical Association* ("*JAMA*"). That is enough because (1) this Court has not been asked to determine the amount of any refund (if any) due AMA (as n. 1 reflects, it was the parties' joint request in the FPTO to bifurcate the issues in that way) and (2) there are not (at least for the purposes of deciding the legal issues presented) material differences in the data from year to year and among the different periodicals.

*Journal of Diseases of Children* (Stip. ¶¶ 21(b) and 22). In 1977 the total cost of publishing AMA periodicals was $16,572,508. Total other exempt activity costs that year were $39,185,000 (Stip. ¶ 32; Stip. Ex. 7).

3. Most AMA members pay dues to belong to the organization. In 1977 AMA members were in the following categories (Stip. ¶ 2):

| Category | No. of members | Dues |
|---|---|---|
| Regular dues-paying | 147,413 | $250 |
| Interns and residents | 13,706 | 35 |
| Medical students | 14,303 | 15 |
| Dues-exempt members [6] | 32,119 | 0 |

During the years at issue membership "dues include[d] the right to receive" without further payment *JAMA, AM News, Prism* (until it was discontinued) and one of the specialty journals (Stip. ¶¶ 10, 18 and 22; Stip. Ex. 1-D at 6). Those same periodicals were sold to nonmembers for a subscription fee.

4. Dues collected from 1975 through 1978 were used in part for activity costs (including AMA's publication-related costs), while the rest was placed in an "association equity" fund—a reserve fund of liquid assets to be used in the event of a future activity cost deficit (Sammons Aff. ¶¶ 3-5).[7] For example, of the $37,469,346 in dues collected during 1977, $22,640,728 was used to pay part of the $55,757,167 in total activity costs, with the remainder ($14,828,618) placed in the association equity account

(Stip. ¶ 4). Amounts added to the association equity account in 1975 through 1978 remained on AMA's books as association equity or some other capital liability account through 1984 (Sammon Aff. ¶ 6). In 1985, when AMA's revenues were not sufficient to pay its activity costs, AMA reduced its association equity fund to reflect use of the reserves and treated (for accounting purposes) the funds so used as dues received that year (*id.*).

B. *Sale of Advertising in AMA Periodicals*

5. To defray publishing costs, AMA sells advertising in its periodicals, primarily to pharmaceutical companies (Hannon Aff. ¶¶ 3 and 5). During 1977 *JAMA* costs and revenues were as follows (Stip. ¶¶ 11 and 13):

| Costs | | |
|---|---|---|
| Advertising content | Readership content | Total |
| $3,850,035 | $4,525,873 | $8,375,908 |

| Revenues | | |
|---|---|---|
| Subscriptions | Miscellaneous | Advertising | Total |
| $916,428 | $12,680 | $5,956,084 | $6,885,192 |

6. In selling advertising in its periodicals, AMA competes with publishers of many other periodicals distributed to physicians (Hannon Aff. ¶ 4). Pharmaceutical

---

6. Dues-exempt members were those who had attained either age 70 or, if they had retired from active practice, age 65.

7. Sammons Aff. ¶ 3 explains AMA had incurred operating deficits in years through 1974. Hence in 1975 each AMA member was required to pay a $60 special assessment (in addition to dues of $110) to build a reserve fund in the association equity account. In 1976 annual dues were raised to $250 to continue building that reserve fund (*id.* ¶ 14; Stip. ¶ 2).

manufacturers have developed sophisticated methods of measuring the effectiveness of advertising in individual periodicals, using a number of widely accepted audience measurement reports (*id.* ¶ 5; Stip. ¶¶ 23–28). Those reports permit manufacturers to determine the types of physicians most likely to prescribe their products and the periodicals that will reach the largest number of those high-prescribing groups (*id.*).

7. Most periodicals competing with *JAMA* and *AM News* for advertisements, and virtually all medical periodicals published by commercial publishers, distribute their periodicals free of charge to physicians falling within the categories most likely to use or prescribe the products sold by prospective advertisers (*id.* ¶ 7; Stip. ¶ 10).[8] Such free distribution to attract advertising is called "controlled circulation" (*id.*; Stip. ¶ 10).

8. In each of the years at issue AMA engaged in controlled circulation by distributing *JAMA* (27,000 to 43,000 copies of each issue) and *AM News* (56,000 to 65,000 copies of each issue) free of charge to nonmember physicians in certain specialties (Hannon Aff. ¶ 6; Stip. ¶¶ 10, 11 and 15). AMA also used controlled circulation for *Prism* until it was discontinued (Hannon Aff. ¶ 6). In choosing those "control group" physicians AMA relied in large part

on data published by the National Disease and Therapeutic Index and the knowledge that AMA competitors were distributing their periodicals free of charge to those physicians (*id.*). AMA's purpose in engaging in controlled circulation was to provide coverage to advertisers comparable to that offered by competing medical periodicals and thus to increase advertising revenues of the periodicals (*id.*).

9. Some AMA members belonged to the control group and thus would have received *JAMA, AM News* and *Prism* free of charge even had they not belonged to AMA (*id.*).[9] Indeed, when those members later resigned from the AMA, they continued to receive the AMA periodicals free of charge (Stip. ¶¶ 13 and 15).

II. *Relevant Tax Laws and Regulations*

10. AMA has been recognized by IRS as a professional association under Code § 501(c)(6) and is thus exempt from federal income tax under Code § 501(a). Despite that tax-exempt status, AMA must pay taxes on its "unrelated business taxable income" (Code § 511), defined as (Code § 512(a)(1), emphasis added):

> the gross income derived by any organization from any unrelated trade or business (as defined in section 513) regularly carried on by it *less the deductions*

---

8. These are the average distribution figures and subscription prices, for the six months ended December 1978, for the five periodicals AMA considers to be the chief competitors for advertising in *JAMA* and *AM News* (Hannon Aff. ¶ 4; Exs. P–2 and P–3):

| Periodical | Free Distribution to Physicians | Paid Circulation | Annual Subscription Price |
|---|---|---|---|
| Modern Medicine | 122,039 | 1,861 | $25 |
| Medical World News | 175,710 | 6,075 | 25 |
| Patient Care | 107,537 | 3,136 | 20 |
| MD Medical Newsmagazine | 182,985 | 1,117 | 15 |
| Medical Economics | 147,898 | 26,883 | 39 |

---

9. This was *JAMA*'s 1977 distribution (Stip. ¶ 11):

| Category | Number | | Category | Number |
|---|---|---|---|---|
| 1. AMA Members | 175,422 | | 4. Paid Subscribers | 32,788 |
| 2. Nonmember Controlled Circulation | 39,122 | | 5. Advertisers (free) | 940 |
| 3. Member Controlled Circulation | 66,210 | | 6. Miscellaneous (free) | 1,031 |
| | | | Total | 249,303 |

*allowed by this chapter which are directly connected with the carrying on of such trade or business....*[10]

Reg. § 1.513–1(b) (emphasis added) explains the purpose of that tax:

The primary objective of adoption of the unrelated business income tax was to eliminate a source of unfair competition by placing the unrelated business activities of certain exempt organizations *upon the same tax basis as the non-exempt business endeavors with which they compete.*

See also *United States v. American College of Physicians,* 475 U.S. 834, 106 S.Ct. 1591, 1594, 89 L.Ed.2d 841 (1986) (Congress sought to strike "a balance between its two objectives of encouraging benevolent enterprise and restraining unfair competition....").

11. It is undisputed for purposes of this case that the income AMA earned from 1975 through 1978 from advertisements in its periodicals was "unrelated business taxable income" and therefore taxable (AMA Mem. 4). AMA calculated that taxable income each year based on its interpretation of the Treasury regulations. It reported taxable income for *JAMA* and *AM News* for the entire four-year period in an amount equal to 12.7% of the total advertising revenues received for those two periodicals (Stip. ¶¶ 5, 34; Stip. Exs. 6–A–D; AMA Mem. Ex. A).

12. Later IRS redetermined AMA's unrelated taxable business income, finding it exceeded 37% of advertising revenues, and concluded AMA owed additional taxes on that income (Stip. ¶¶ 6, 35; Stip. Ex. 7; AMA Mem. Ex. A). Although IRS did not disagree with the total advertising revenues and total expenses reported by AMA for its periodicals, it disagreed with AMA's interpretation of Treasury regulations governing the deductibility of periodical costs.

13. According to the regulations, periodical costs fall into two categories:

(a) "Direct advertising costs" are costs "directly connected with the sale and publication of advertising," such as the cost of producing and distributing the advertising content of periodicals (Reg. (f)(6)(ii)). Direct advertising costs are fully deductible from gross advertising income (Reg. (f)(2)(i)).

(b) "Readership costs" are costs "directly connected with the production and distribution of the readership content. of the periodical"—all costs "not allocated to direct advertising costs" (Reg. (f)(6)(iii)). Readership costs are deductible from gross advertising income only to the extent they exceed "circulation income" (Reg. (f)(2)(ii)(b)).[11]

Circulation income is defined in Reg. (f)(3)(iii) (emphasis added) as:

the income attributable to the production, distribution or circulation of a periodical (other than gross advertising income) including all amounts realized from or attributable to the sale or distribution of the readership content of the periodical, such as amounts realized from charges made for reprinting or republishing arti-

---

**10.** [Footnote by this Court] Code § 513 defines an "unrelated trade or business" this way:

[A]ny trade or business the conduct of which is not substantially related (aside from the need of such organization for income or funds or the use it makes of the profits derived) to the exercise or performance by such organization of its charitable, educational, or other purpose or function constituting the basis for its exemption....

**11.** Reg. (d)(1) hints at the rationale behind that limitation on the deductibility of readership costs. It notes:

1. Periodicals in which advertising is sold typically contain "editorial material related to the accomplishment of the organization's exempt purpose."

2. Expenses and other items attributable to that editorial material are therefore "incident to an activity which is carried on in furtherance of the exempt purpose of the organization."

3. Those expenses and other items therefore do not possess the "necessary proximate and primary relationship to the unrelated trade or business activity and are therefore not directly connected with that business activity."

That being so, Reg. (d)(2)(ii) continues:

[E]xpenses, depreciation and similar items paid or incurred in the performance of an exempt activity must be allocated first to the exempt activity to the extent of the income derived from or attributable to the performance of that activity.

cles and special items in the periodical and amounts realized from sales of back issues. *Where the right to receive an exempt organization periodical is associated with membership or similar status in such organization for which dues, fees or other charges are received (hereinafter referred to as "membership receipts"), circulation income includes the portion of such membership receipts allocable to the periodical (hereinafter referred to as "allocable membership receipts").*

14. Allocable membership receipts, in other words, represent members' "payments" by their dues, rather than a separate subscription charge, for periodicals they receive. Thus Reg. (f)(3)(iii) explains:

Allocable membership receipts is the amount which would have been charged and paid if—

(a) The periodical was that of a taxable organization,

(b) The periodical was published for profit, and

(c) The member was an unrelated party dealing with the taxable organization at arm's length.

That provision in turn refers to Reg. (f)(4) "for a discussion of the factors to be considered in determining allocable membership receipts. . . ." Reg. (f)(4) actually sets out three methods for determining the amount of membership receipts to be allocated to the circulation income of a particular periodical. Only two of those are relevant here: [12]

(a) Method 1 (Reg. (f)(4)(i)) applies to most of the AMA specialty journals:

*Subscription price charged to nonmembers.* If 20 percent or more of the total circulation of a periodical consist of sales to nonmembers, the subscription price charged to such nonmembers shall determine the price of the periodical for purposes of allocating membership receipts to the periodical.

(b) Method 3 (Reg. (f)(4)(iii)) applies to *JAMA, AMA News* and *Archives of Surgery:*

*Pro rata allocation of membership receipts.* Since it may generally be assumed that membership receipts and gross advertising income are equally available for all the exempt activities (including the periodical) of the organization, the share of membership receipts allocated to the periodical, where paragraphs f(4)(i) and (ii) of this section do not apply, shall be an amount equal to the organization's membership receipts multiplied by a fraction the numerator of which is the total periodical costs and the denominator of which is such costs plus the cost of other exempt activities of the organization.

15. In September 1971, when the proposed amendments to Reg. § 1.512(a)–1 were announced in a "Notice of Proposed Rule Making" (36 Fed.Reg. 18,316), Reg. (f)(4) contained seven factors to be used in determining the allocation of membership receipts to a periodical's circulation income (Stip. ¶ 30; Ex. 4).[13] But when the Decem-

---

12. Method 2, which does not apply to AMA's publications, is set out in Reg. (f)(4)(ii):

If paragraph f(4)(i) of this section does not apply and if the membership dues from 20 percent or more of the members of an exempt organization are less than those received from the other members because the former members do not receive the periodical, the amount of the reduction in membership dues for a member not receiving the periodical shall determine the price of the periodical for purposes of allocating membership receipts to the periodical.

13. Those factors were:
1. Subscription price charged to nonmembers.

2. Subscription price to members.
3. Subscription price of comparable periodicals of taxable organizations.
4. Rate of return.
5. Relationship of revenues from sales of periodicals of taxable organizations to revenues from sales of advertising.
6. Relationship of revenues from sales of periodicals of taxable organizations to total periodical costs.
7. Pro rata allocation of membership receipts.
According to the then-proposed Reg. (f)(4), "all facts and circumstances involved in each case" were to be considered in determining allocable membership receipts. Under some circumstances, however, the determination was to be

ber 18, 1975 notice announcing the adoption of final amendments to Reg. § 1.512(a)–1 was published (40 Fed.Reg. 58,637), Reg. (f)(4) contained only the current three methods for determining allocable membership receipts (Stip. ¶ 31; Stip. Ex. 5).

### Conclusions of Law

Jurisdiction over this action exists under 28 U.S.C. § 1346(a)(1). There has been no dispute on that score, and subject matter jurisdiction is clear in any event.

Before this opinion turns to the Conclusions themselves, it is useful to identify AMA's lines of attack in this litigation. AMA contends IRS committed six errors in calculating deductions from taxable advertising income to which AMA is entitled under Reg. § 1.512(a)–1. One relates to the deduction of direct advertising costs and the others relate to the deduction of readership costs:

1. *Direct advertising costs:* AMA argues IRS' calculation of taxable advertising income from *JAMA, AM News* and *Prism* should have treated as fully deductible direct advertising costs (rather than partially deductible readership costs) the costs of producing and distributing the "readership content" of periodicals distributed free of charge to nonmember physicians in the control group to increase advertising revenues.

2. *Readership costs:* AMA argues IRS committed five errors in calculating membership receipts allocable to the circulation income of each periodical, resulting in too high an allocation of membership receipts to each periodical's circulation income and consequently in too small a deduction of readership costs for each periodical:

(a) In calculating membership receipts allocable to the circulation income of certain periodicals under method 3 in Reg. (f)(4)(iii),[14] IRS purportedly committed three errors:

1. As to *JAMA, AM News* and *Archives of Surgery*, it should not have included among total membership receipts the AMA dues placed in the association equity account rather than used to pay activity costs.

2. As to *JAMA* and *AM News*, it should not have included among total membership receipts the dues collected from AMA members in the control group who would have received those periodicals free of charge from AMA even had they not been dues-paying members.

3. As to *JAMA* and *AM News*, it should have included as part of the "cost of other exempt activities" (in the denominator of the n. 14 formula) the *total* costs of all other AMA periodicals, not just the readership costs of those periodicals.

(b) In calculating membership receipts allocable to each specialty journal's circulation income under method 1 in Reg. (f)(4)(i), IRS assertedly committed two errors:

1. It should have determined the yearly "subscription price charged to such nonmembers" was $14 (one-half the two-year subscription rate) rather than $18 (the one-year subscription rate).

2. It should have used only a percentage of the "subscription price charged to such nonmembers" in determining the price of the periodical for AMA members paying reduced dues.

---

based solely on consideration of one of the first three factors rather than all seven factors. In addition, factor 3 expressly noted:

> The fact that a taxable organization issues a periodical which is comparable to an exempt organization periodical and makes a practice of distributing substantially all of its circulation at no charge is substantial evidence that none of the membership receipts of the exempt organization are allocable to its periodical.

14. In algebraic form, allocable membership receipts under that method are equal to (with "a" representing total membership receipts, "b" representing total periodical costs and "c" representing the cost of AMA's other exempt activities):

$$a \times \frac{b}{b + c}$$

Finally, as stated at the outset of this opinion, AMA has an alternative or fallback position: If IRS correctly construed the regulations, then those regulations are invalid because they conflict with the Code. These Conclusions will deal with each AMA contention in turn.

*Direct Advertising Costs*

This opinion has found AMA distributed copies of *JAMA, AM News* and *Prism* free of charge to nonmember physicians in the control group for the purpose of increasing advertising revenues. AMA Mem. 27–30 urges IRS therefore erred when it refused to permit AMA to deduct as direct advertising costs the costs of producing and distributing the readership content in those copies.

G. Mem. 21–22 responds by attacking the predicate for that argument: It asserts AMA's tax-exempt goal is education, so AMA cannot now claim it sends periodicals to doctors solely to generate advertising revenue. But G. Mem. 22 reaches that conclusion by misstating the evidence:

> If, in fact, the sole purpose of the AMA in distributing JAMA and the AM News is simply to obtain revenues from the advertisements for drugs, all of its circulation income should be taxable and the exemption of the AMA itself might come into question.

Of course AMA does not contend it distributed *all* copies of those periodicals solely for the purpose of increasing advertising revenue. Nor does it seek to deduct as a direct advertising cost the readership content cost of *all* copies of the periodicals. Instead AMA contends (and has proved) it sent periodicals to certain nonmember physicians solely to generate advertising revenue. As to those copies of the periodicals, all the advertising revenue from which AMA must treat as taxable income, it seeks to deduct all (even the readership content) costs.

 Nothing in the Code or regulations bars AMA, just because of its tax-exempt status, from incurring such costs to generate advertising income (*Rensselaer Polytechnic Institute v. Commissioner of Internal Revenue*, 732 F.2d 1058, 1062 (2d Cir.1984)). Indeed the tax laws and regulations expressly provide for the taxation of non-exempt income as well as the deduction of certain costs from that income. And as *Rensselaer* explained (*id.*):

> Moreover, should the [tax-exempt organization] so pervert its operations that the institution no longer "engages primarily in activities which accomplish * * (its exempt purposes)," Treas.Reg. § 1.501(c)(3)–1(c)(1), the commissioner has adequate remedies available to correct any abuse or even terminate the exemption.

While it may well be those nonmember physicians read and learned from the readership content in the free periodicals, that does not alter AMA's income-generating motivation for sending them.[15]

---

**15.** IRS Technical Advice Memorandum ("TAM") No. 8305002 (not cited by the government's memorandum but supplied by AMA R. Mem. Ex. 2 in support of another argument) appears to have held otherwise. There the exempt organization urged it had distributed some periodicals solely to increase advertising revenue without caring whether or not the periodicals were ever read, so it should have been permitted to deduct the incremental cost incurred in distributing those periodicals. TAM at 5 concluded the organization could not deduct those incremental costs despite its motivation in incurring them, reasoning (sic):

1. Advertisements are placed in periodicals to be read. Thus the taxpayer was not "unconcerned" with whether or not the courtesy copies were read.

2. That purported "unconcern" was also belied by the fact that the organization distrib-

uted the periodical to various educational institutions.

3. Such distribution was an example of the activities the taxpayer engages in for the purpose of supporting education in its area of interest.

That approach is both illogical and unpersuasive, because it misses the whole point. Whenever any publisher focuses on advertising revenues and not reader subscriptions as the primary (or even sole) revenue source—and that is true of countless handout publications as well as AMA's competitors (see n. 8)—the rational publisher's focus is on what the *advertisers* perceive as best calculated to reach their market. That means the publication has to deliver whatever message and contain whatever content (educational, entertainment or anything else) the advertisers regard as probably attractive to the readers and most likely to cause them to notice

That, however, is not the end of the analysis, though it seems the limit of the government's line of attack. Though this Court has found AMA produced and distributed the control-group periodicals solely to generate advertising revenue, the question remains whether the cost of producing and distributing the *readership content* of those periodicals is deductible as a direct advertising cost.

To resolve that question, this opinion looks first to the regulations.[16] Reg. (f)(6)(ii) defines direct (fully-deductible) advertising costs as costs "directly connected with the sale and publication of advertising." That definition would seem to cover *all* costs of producing and distributing periodicals (even costs attributable to readership content in those periodicals) whose sole aim was to increase advertising revenue. Nonetheless the same regulation also provides (*id.*):

> The items allowable as deductions under this [direct advertising cost] subdivision do not include any items of deduction attributable to the production or distribution of the readership content of the periodical.

Linked to that provision, Reg. (f)(6)(iii) defines readership costs as items "directly connected with the production and distribution of the readership content of the periodical."

■ As construed (implicitly) by the government's memorandum, those regulations create a per se rule: Costs attributable to, or directly connected with, the production and distribution of the readership content (as opposed to the advertising content) of a periodical cannot be "directly connected with the sale and publication of advertising" and hence are never deductible as direct advertising costs. Yet the government is understandably silent as to any justification for such a per se reading. After all, the whole purpose of enacting the unrelated-business-income provisions of the Code was to eliminate unfair competition between tax-exempt and taxable organizations by imposing the *same* tax on income of the former unrelated to a tax-exempt purpose.[17] Just like its commercial competitors, AMA (1) distributes "control group" periodicals solely to generate advertising income, (2) gets no circulation income from that distribution and (3) pays taxes on the advertising revenue generated from the distribution. Yet IRS permits commercial publishers but not AMA to deduct the readership content costs of such periodicals.

Far more reasonable, and wholly consistent with the Code's purpose, is the construction of the regulations proposed by AMA Mem. 29 (emphasis in original):

> An item of deduction is "attributable to" [or "directly connected with"] the production or distribution of the readership content only if dissemination of readership content for its own sake is a primary purpose of the item. Where costs are incurred *solely* for the purpose of increasing advertising revenues, these costs are not "attributable to" [or "directly connected with"] the readership content, even if they necessarily include

---

and consider the advertisers' message as well. In the case of a not-for-profit organization that also engages in publication, the mere fact that the advertisers may perceive their market as best reachable by the same kind of educational message the organization seeks to deliver should not unduly penalize the organization—as IRS would do. That then is the focus of the next portion of the text.

16. Normally, of course, this Court would turn first to the language of the Code itself. In this instance, though, the Code expresses more general principles rather than case-specific terminology (Code § 512(a)(1)):

> deductions allowed by this chapter which are directly connected with the carrying on of such trade or business....

17. Most likely (given the vintage of those Code provisions) the present government counsel were not engaged in the active practice of tax law, as was the writer of this opinion, when the notorious New York University spaghetti factory and other like commercial activities under tax-exempt umbrellas stimulated Congress to act. But a little study of history (as well as logic) would teach that the congressional goal was to create parity of treatment and not to punish the exempt organization from having strayed beyond its bounds (so long, of course, as the nonexempt activities did not occupy too large a portion of the total organizational spectrum—thus forfeiting the underlying tax exemption altogether).

some costs of physically producing and distributing readership material.

That construction comports with the Code's objective of equal tax treatment: It permits AMA, like its commercial competitors, to deduct readership content costs when they are incurred solely to generate advertising revenue rather than to further AMA's exempt purposes. Accordingly this Court concludes AMA should have been permitted to deduct the readership-content costs of periodicals distributed to control-group physicians to generate advertising revenue.[18]

*Readership Costs: Allocable Membership Receipts Under Method 3*

 Readership costs of a periodical are deductible against unrelated taxable income only to the extent they exceed that periodical's circulation income. For that purpose the circulation income of an AMA periodical distributed to members because they pay dues includes whatever portion of the total dues (allocable membership receipts) represents payment for the periodical.

 Because it is not possible (according to the regulations) to calculate the subscription price of *JAMA, AM News* and *Archives of Surgery* under methods 1 and 2 (Reg. (f)(4)(i) and (f)(4)(ii)), allocable membership receipts are determined under method 3 (Reg. (f)(4)(iii)) under the formula found at n. 14. That formula lumps the total periodical costs and the cost of all the organization's other exempt activities into the denominator, on the assumption that membership receipts and gross advertising income are "equally available for all the AMA's exempt activities (including the periodical) of the organization ..." (*id.*). Thus method 3 assigns to any specific periodical a portion of total membership receipts used for *all* exempt activities in proportion to its costs.[19]

That forms the background for AMA's first challenge on readership-cost grounds. All its membership receipts collected in each of the years 1975 through 1978 were *not* used for exempt activities when collected. Instead some of those dues were placed in an "association equity" account—a reserve fund to be used if activity costs ever exceeded revenues. For example, in 1977 AMA collected $37,469,346 in dues but placed $14,828,618 in the association equity account, applying $22,640,728 to pay AMA activity costs that year. That means a portion of just that $22,640,728 (and not of the entire $37,469,346) in collected dues was available for each AMA periodical.

 AMA Mem. 34–36 is therefore right in urging the regulations should be construed to exclude from each year's total membership receipts (for formula purposes) any dues collected that year but placed in the association equity account. Because such dues were not actually used for *any* activity costs (including periodical costs) in the year collected, there is no basis for concluding a portion of those dues were used for the costs of a particular periodical that year. Cf. TAM No. 8305002 at 3–4 (provided in AMA R. Mem. Ex. 2).[20]

---

**18.** As this opinion has stated earlier (see n. 1), the litigants have not seen fit to tender the actual numbers as well as the legal concepts for resolution by this Court. It should therefore be understood that this opinion also does not address any problems inherent in calculating the amount of any refund (one obvious example is whether the readership-content costs referred to in the text should be determined on a ratably-allocated basis, an incremental-cost basis or in some other fashion).

**19.** *American Hospital Ass'n v. United States,* 654 F.Supp. 1152, 1155 (N.D.Ill.1987) noted:

The pro rata allocation method [3] is less favored since it is predicated on an assumption by the IRS as to how the membership dues should be allocated to the expenses relating to the tax-free organization's exempt activities. As the language of subdivision (f)(4)(iii) suggests, the assumption that membership receipts and gross advertising income are equally available for all the exempt activities, while generally true, is by no means valid in every circumstance. Thus, the more objective tests contained in (i) and (ii) are preferable if they can be met since they value the periodical in terms of what subscribers actually pay for it, and therefore more clearly treat the tax-free organization as if it were a taxable entity.

**20.** That TAM rejected an exempt organization's argument that only the average (not actual) amount of dues paid by members (some of whom paid more dues than others) should be included as total membership receipts in com-

Instead such dues should be included, for formula purposes, as total membership receipts in the year they are taken from the association equity fund and actually used for activity costs—as AMA did in 1985 (Sammons Aff. ¶ 6).[21] That way the "equally-available" assumption underlying the method 3 formula holds true, and the formula does not allocate a greater percentage of membership receipts than of advertising revenue to activity costs.

G. Mem. 22–24 nonetheless insists *all* dues must be included as membership receipts in the year collected for three reasons:

1. Reg. (f)(3)(iii) defines membership receipts as "dues, fees or other charges," covering all dues regardless of whether they are used for activity costs.

2. Because AMA members were able to deduct the dues paid to AMA, AMA was not taxed unfairly as compared to its commercial competitors who did not have to treat capital contributions as receipts.

3. Widespread tax avoidance or endless disputes with IRS auditors would result were AMA permitted to allocate funds to a capital account.

None of those arguments has merit.

First, in light of the regulation's purpose, the only way to avert a successful attack on its validity is to construe "membership receipts" in a given year—for formula purposes—to mean dues, fees or other charges *used for activity costs that year.* Second, the ability of AMA *members* to deduct their dues each year is simply and obviously irrelevant to the question of *AMA*'s entitlement to certain deductions from taxable advertising income. Finally this Court rejects the government's bald assertion that widespread tax avoidance or endless

disputes with IRS would result from the proposed construction of the regulation. No reason is suggested (1) why AMA and like organizations could not be required to report, and IRS could not determine from AMA's financial records, whether and when dues initially placed in the association equity account were later used for activity costs and (2) why those dues could not be reported as membership receipts at that later time.

■ AMA's second attack in the readership cost area stems from the fact that many AMA members were within the physician group most likely to prescribe the products sold by prospective advertisers, so those members would have received AMA periodicals free of charge even had they not been dues-paying AMA members. AMA Mem. 37–38 thus argues the dues of those members should have been excluded from total membership receipts in the method 3 formula, reasoning:

1. Reg. (f)(3)(iii) says circulation income should approximate the amount that would be "charged and paid" by members if "the periodical was that of a taxable organization ... published for profit."

2. Any commercial publisher of *JAMA* and *AM News*, dealing at arm's length with the AMA control-group members, would not charge them for the periodicals.

3. Equal tax treatment would therefore be attained only if the dues of those AMA members are excluded from total membership receipts.

What that analysis ignores, however, is that the control-group AMA members had to and did pay dues to be members. And those dues (like the dues of all other AMA

---

puting allocable membership receipts under Reg. (f)(4)(iii):

> Although we agree that certain items of payments from members, i.e., amounts specifically earmarked for research and/or that cannot be spent on other activities, and amounts passing through to the local chapters, will not be included in any of the calculations for determining allocable membership receipts, we cannot agree that the balance of amounts received from members in excess of $* * * *

> * per member should be excluded from the calculation of membership receipts.

Although that TAM is not a precedent binding on IRS, it is instructive in interpreting the regulation.

21. AMA Mem. 35–36 suggests one other alternative would be to treat the dues allocated to the association equity account as a "cost of other exempt activities" in the denominator of the equation. That would be, bad mathematics as well as conceptually incorrect.

members) were available to defray periodical costs.[22] In other words, AMA (unlike its commercial counterparts) was able to *require* those physicians who chose membership to subscribe to AMA's periodicals, and it thus derived subscription income from such distribution. That being so, it is really irrelevant that a commercial publisher would not have charged the control-group members for periodicals. To the extent AMA in fact derived income from that distribution (see n. 22), that income should be considered in determining the AMA periodicals' circulation income.

This opinion therefore rejects AMA's contention. Instead this Court construes Reg. (f)(4)(iii) as properly calling for the inclusion of the dues of AMA control-group members in AMA's total membership receipts.[23]

▪ AMA Mem. 38 asserts IRS committed one other error in calculating allocable membership receipts under the method 3 formula. This time AMA disputes IRS' computation of the "cost of other exempt activities" in the denominator of the formula (term "c" in the algebraic version expressed in n. 14).

As a preliminary matter, both sides agree that where an organization (1) publishes only one periodical or (2) publishes more than one periodical but treats their income on a consolidated basis (as permitted under Reg. (f)(7)(i)), the total costs of all periodicals are included in both the numerator and denominator of the method 3

formula as "total periodical costs" (term "b" in the formula). That being so, AMA Mem. 38–40 reasons where an organization such as AMA publishes more than one periodical but does *not* consolidate their income, the total costs for all periodicals should likewise be included in both the numerator and denominator of the formula by reading the regulation this way:

1. "Total periodical costs," as to any individual periodical for which allocable membership receipts are being computed, are the full costs of that periodical.

2. "Cost of other exempt activities," as to the same periodical, is the cost of all other exempt activities including the *total* costs of all other AMA periodicals.[24]

IRS took a very different approach to calculating the "cost of other exempt activities" as to any individual periodical: It included only the *readership* costs of other AMA periodicals. As AMA Mem. 40 points out, that calculation (by decreasing the denominator in each instance) caused more membership receipts to be allocated to circulation income than if exactly the same periodicals had been published by separate organizations or reported on a consolidated basis. That meant a higher circulation income was attributed to the AMA periodicals, in turn leading to a lower readership costs deduction for those periodicals.

G. Mem. 23–24 provides no basis whatever for the IRS's skewed reading of the

---

22. Had those physicians been interested only in the periodicals, they were free to opt for free-rider status rather than joining AMA. But they obviously valued AMA membership for other purposes (as did all the other physicians outside the control group). AMA's position—which would attribute *no* cost at all to the periodicals distributed to the control-group physicians—necessarily carries with it the corollary that those physicians therefore paid more for the other perceived benefits of AMA membership (100% of their dues) than those in the non-control group. And that would in turn mean AMA derived *all* the dues income received from those control-group members as a result of AMA's non-periodical services, and *none* from the periodicals. Nothing is offered to support that ipse dixit.

23. For the same reasons this Court rejects the AMA Mem. 45 argument that Reg. (f)(4)(iii) is inconsistent with the Code, and thus invalid, because it includes dues of members who would not have to pay for a comparable periodical published by a taxable organization. As for AMA's other asserted grounds for invalidating that regulation (e.g., lack of notice), this opinion need not evaluate them because all other aspects of AMA's claim are supported by the regulation.

24. Under that approach the formula denominator would always be the same, while the sum of the individual numerators would equal "b" in the n. 14 formula: the total costs of *all* periodicals. Hence the nonconsolidated income calculation would be identical to the calculation for a consolidated-income taxpayer.

regulation.[25] Instead it argues AMA was not prejudiced by that reading because AMA could have elected to consolidate its publications, thus avoiding any inequity it perceived from treating each publication separately. Even if true, that assertion provides no support at all for IRS's distorted construction of the regulation.

This Court concludes the "cost of other exempt activities" in the denominator of the method 3 formula includes *all* costs (not just readership costs) of other AMA periodicals. In addition to rendering uniform the regulation's application as between organizations that do and do not consolidate, that construction is consistent with the purpose of the regulation: allocation of a portion of total membership receipts to a single periodical in proportion to its costs. After all, membership receipts are available for *all* exempt activity costs. It makes absolutely no sense to exclude the costs other than readership costs of AMA's other periodicals in making the allocation, especially when all those costs of the individual periodical *are* included in the formula.

*Readership Costs: Allocable Membership Receipts Under Method 1*

■ AMA also complains of two aspects of the IRS treatment of its specialty journals. As already indicated, the membership receipts allocated to the circulation income of those journals are properly calculated by the use of method 1 (Reg. (f)(4)(i)). Under method 1 the subscription price charged to nonmembers for a periodical determines the periodical's price for purposes of allocating membership receipts to that periodical's circulation income.

When AMA applied method 1 to determine allocable membership receipts for its four specialty journals, it used one-half the two-year subscription rate (or $14) and an equivalent percentage of the dues of members receiving the periodicals but paying reduced dues. When IRS redetermined AMA's taxes, it used the one-year subscription rate ($18) for all members receiving the periodicals. Neither side offers any reason for choosing one subscription rate over the other. AMA Mem. 63 says simply:

> The IRS construction ... is wholly unrealistic because it ignores the fact that more than one "subscription price" was charged to nonmembers.

And G. Mem. 25 ignores the issues completely.

As for the first question, this Court concludes IRS correctly used the one-year subscription rate in determining the price of the specialty periodicals to AMA members who pay full dues *each year*. After all, the reduced two-year subscription rate is given only to those nonmembers who commit themselves to purchasing an AMA periodical for two consecutive years. To the extent an AMA member makes only a *one-year* commitment to belong to AMA by paying yearly dues, he or she also makes an identical one-year commitment to purchase AMA periodicals. Each year that same AMA member is thus able to decide whether or not to renew his or her membership, and consequently whether or not to continue to receive the periodicals, by paying his or her dues. There is no guaranty the AMA member will "subscribe" to AMA periodicals for longer than that single year. Accordingly there is no basis for finding the reduced two-year subscription rate should have been considered the rate charged to such AMA members.[26]

---

**25.** All G. Mem. 23–24 says is this:

Although the AMA's interpretation at first glance appears reasonable, it ignores the fact that for dues to be considered exempt, they should be allocated to an exempt purpose. An organization with high advertising costs but low circulation expenses would have dues allocated toward advertising a non-exempt purpose.

This Court finds that argument (as did AMA R. Mem. 13) incomprehensible. Indeed, the unsoundness of the IRS contention is in a way confirmed by the fact it would produce a series of different denominators (an intuitively suspicious result to anyone having even a modicum of familiarity with mathematics).

**26.** Of course as to AMA members (if any) who actually did commit themselves in advance to remain as members for longer than one year, the lower subscription rate would be appropriate.

■ Only one question remains: the proper treatment of periodicals sent to AMA members whose dues were far below the $250 annual level paid by regular members in 1976 through 1978: interns and residents (who paid only $35 in dues) and medical students (who paid just $15). AMA Mem. 63–64 says it was "illogical" for IRS to have applied method 1 by treating $18 as the price of periodicals sent to those members:

Indeed, a construction of [Reg. (f)(4)(i)] resulting in allocation from individual members of more dues that [sic] they paid would be so irrational as to render that subdivision as so applied invalid.

G. Mem. 25 responds:

However, the [IRS] followed the regulations even though it did not necessarily allocate the precise amount of the medical student and other members who paid less dues than regular members. This seems reasonable in that medical students in any event would probably be more interested in reading these publications for their scholarly content than some of the other members. The dues rate of $15 per year is still less than what it would cost a medical student to subscribe to these periodicals.

As before, the government has forgotten the entire purpose of the regulation: allocation of a portion of members' dues to the circulation income of periodicals received by those members, representing payment for the periodicals. Because AMA receives only $15 in total fees from each medical-student member, it would be totally unreasonable to allocate $18 to the circulation income of a periodical sent to that member. And though the numbers for interns and residents are not so graphically absurd, the principle is identical. In each instance the amount received from the low income (or no-income) member of the profession—a kind of "loss leader"—must be viewed as being in payment for *all* AMA exempt activities, and it must be allocated accordingly. Thus the proper application of method 1 to those members calls for

1. determining what percentage of the annual dues of a full-dues-paying member is allocable to a periodical's circulation income (based on the one-year subscription rate charged to nonmembers) and then

2. allocating that same percentage of dues from members paying reduced dues to that periodical's circulation income.

\* \* \* \* \* \*

In summary, for each of the years 1975 through 1978:

1. AMA was entitled to deduct, as direct advertising costs, all its costs of producing and distributing the readership content of all its periodicals sent free of charge to nonmember physicians in the control group.

2. As for calculations regarding *JAMA, AM News* and *Archives of Surgery* under regulation method 3 (Reg. (f)(4)(iii)):

(a) AMA's "total membership receipts" during a year included the dues actually used for AMA's activity costs, but not the dues placed in an association equity account as a reserve fund to cover any future deficit in meeting activity costs.

(b) AMA could not exclude from its "total membership receipts" the dues paid by its members who would have received its periodicals free of charge even had they not been dues-paying AMA members.

(c) AMA's "cost of other exempt activities," as to any individual periodical, included the total cost of all other AMA periodicals—not merely their readership costs.

3. As for calculations regarding each of AMA's specialty journals under regulation method 1 (Reg. (f)(4)(i)):

(a) AMA's circulation income from each of its regular-dues-paying members is equal to the one-year subscription price charged to AMA nonmembers (except where the member has paid membership dues for more than one year in advance).

(b) AMA's circulation income from each of its discount-dues-paying members is the amount calculated under the preceding subparagraph, multiplied

by the ratio between that individual's dues and those paid by a regular-dues-paying member.

This action is set for a status hearing June 29, 1987 at 9 a.m., when counsel are directed to report on the future conduct of the litigation.

## SUPPLEMENT TO MEMORANDUM OPINION AND ORDER

This Court's June 22, 1987 memorandum opinion and order (the "Opinion")[1] set out Findings and Conclusions as to AMA's claim for a refund of federal income taxes imposed on AMA income earned in the years 1975 through 1978 from the sale of advertising in AMA periodicals. AMA had contended that IRS denied deductions for AMA's costs of producing and distributing its periodicals that, because those deductions would have been allowed a commercial publisher, are also permitted AMA under Code §§ 511–513. Because IRS construed the Code-implementing Treasury regulations to preclude those deductions, AMA had urged alternatively:

1. IRS construed the regulations erroneously and thus committed six errors in calculating AMA's deductions.

2. If IRS construed the regulations correctly, they are inconsistent with the Code and therefore invalid.

█ In the Opinion this Court concluded IRS had indeed misconstrued the regulations in most of the ways alleged by AMA, committing four of the six claimed calculation errors. That being so, the Opinion did not reach AMA's alternative ground for relief: the asserted invalidity of the regulations. Now AMA requests this Court to resolve that issue,[2] asserting:

1. All of Reg. (f) ("Determination of unrelated business taxable income derived from sale of advertising in exempt organization periodicals") is invalid because it is inconsistent with Code § 512(a)(1).

2. One part of that same regulation, Reg. (f)(4) ("Allocable membership receipts"), is also invalid because it was promulgated without the notice required under the Administrative Procedure Act ("APA"), 5 U.S.C. § 553 ("APA § 553").

According to AMA, such invalidity entitles it, *under the remaining regulations,* to the full tax refund it has requested.

This Court has again reviewed the material previously tendered by the parties, as well as each side's supplemental memorandum addressing the current issues.[3] Because no further factual Findings are needed, this opinion reflects the additional Conclusions required as to challenged regulations.

### Conclusions of Law [4]

I. *Reg. (f): Inconsistency with Code 512(a)(1)*

By way of brief background, Reg. (f) provides rules for the deduction of two categories of periodical costs from taxable advertising income:

1. "Direct advertising costs" are costs "directly connected with the sale and publication of advertising" and are fully deductible.

2. "Readership costs" are costs "directly connected with the production and distribution of the readership content of the periodical" and are deductible only to the extent they exceed "circulation income."

As construed in the Opinion, classification of periodical costs as either "direct advertising costs" or "readership costs" depends on AMA's motivation in incurring the cost—not on the effect of its having done

---

1. This opinion will (1) assume familiarity with the factual statement in the Opinion and (2) follow the same usage of defined terms.

2. AMA Supp. Mem. 3 says the Opinion supports recovery of only about 51% of AMA's refund claim. Because the parties' initial submissions left the actual computation of the *amount* of any refund to their own calculations (based on this Court's resolution of the legal issues), this

Court had no prior knowledge of the dollar impact of its rulings.

3. Those memoranda will be referred to as "AMA Supp. Mem." and "Govt. Supp. Mem."

4. Although the Opinion set out the relevant regulations, some are restated here to facilitate discussion of the issues as now posed.

so.[5] Thus Opinion at 1096 concluded AMA could fully deduct as direct advertising costs even the readership-content costs of periodicals distributed to nonmember control-group physicians, reasoning (*id.* at 1094 and 1095, footnote omitted):

> While it may well be those nonmember physicians read and learned from the readership content in the free periodicals, that does not alter AMA's income-generating motivation in sending them.
>
> \* \* \* \* \* \*
>
> Just like its commercial competitors, AMA (1) distributes "control group" periodicals solely to generate advertising income, (2) gets no circulation income from that distribution and (3) pays taxes on the advertising revenue generated from that distribution.

As for readership-content costs incurred to further AMA's exempt purposes (rather than to generate advertising revenue), Opinion at 1091–92 n. 11 noted the rationale under the regulations for classifying those as partially-deductible "readership costs": Because AMA incurs those costs to further its exempt purpose, they are not "directly connected with" the taxable business activity. Therefore Reg. (f) requires that those costs be allocated *first* to any tax-exempt income derived from the exempt activity, and only *second* (to the extent readership costs exceed exempt income) to taxable advertising income.[6]

AMA Mem. 46 contends such an allocation of costs in Reg. (f) is inconsistent with Code § 512(a)(1) because *all* readership-content costs (except those incurred solely to generate advertising revenue)[7] are allocated initially to circulation income rather than advertising income. AMA says that inconsistency is demonstrated by two things:

1. Even readership costs incurred to further AMA's exempt purpose, rather than to generate advertising income, do in fact *contribute* to advertising income and are therefore "directly connected with" the unrelated business.

2. Commercial publishers are permitted to deduct *all* readership-content costs from taxable advertising income.

But having said all that, AMA Mem. 48 then goes on to acknowledge the *reason* for Reg. (f)'s limitation on the deductibility of those readership costs:

> It is true that tax-exempt periodicals have sources of non-taxable income which are not available to nonexempt organizations, and that this income, as well as advertising income, may be attributable to the readership costs of a tax-exempt periodical. The obvious solution to this problem is to *allocate* the costs of readership content in a reasonable manner between the taxable and the non-taxable income.

Thus AMA really admits there is a permissible reason for Reg. (f)'s limitation on the deductibility of readership costs: It concedes that because its circulation in-

---

**5.** For example, Opinion at 1095 adopted the AMA Mem. 29–30 (emphasis in original) proposed construction of the readership costs definition:

[A]n item of deduction is "attributable to [or 'directly connected with'] the production or distribution of the readership content" only if dissemination of readership content for its own sake is a primary purpose of the item. Where costs are incurred *solely* for the purpose of increasing advertising revenues, these costs are not "attributable to" [or "directly connected with"] the readership content, even if they necessarily include some costs of physically producing and distributing readership material.

**6.** AMA Supp. Mem. 7–8 erroneously attributes a different rationale to that limitation on the deductibility of readership costs—one rejected by the Court in *Rensselaer Polytechnic Institute v. Commissioner,* 732 F.2d 1058, 1062 (2d Cir. 1984). In that case IRS had construed Reg. (c) to mean an expense is not "directly connected with" an unrelated business activity unless the expense would not have been incurred in the absence of the activity—a classic "but for" test. That position was accurately characterized by the *Rensselaer* court as unacceptable "because it would in effect eliminate entirely all deductions for indirect expenses such as depreciation, a result that is not required by statute and that is directly contrary to the regulation" (*id.*).

**7.** This opinion will sometimes refer to such costs (that is, readership-content costs incurred to further AMA's exempt purpose, and not solely to generate advertising revenue) simply as "readership costs."

come is tax-exempt, it should not be permitted to deduct *all* readership costs (as a commercial publisher is permitted to do). What AMA actually challenges, then, is simply the Reg. (f) *method* of limiting the deductibility of those costs. But on that score AMA fails to identify any persuasive reason why the Reg. (f) allocation is unreasonable or inconsistent with Code § 512(a)(1). All AMA says is that readership costs contribute to taxable advertising income as well as to tax-exempt circulation income. From there it leaps to the impermissible conclusion that the *only* reasonable way to allocate those costs is in the ratio of advertising income to circulation income.[8]

Even if it is assumed AMA's proposed allocation method is reasonable—indeed even if AMA's proposed method might arguably be perceived as *more* reasonable than the one provided under Reg. (f)—that would not be reason to invalidate the regulation. As *National Muffler Dealers Association, Inc. v. United States*, 440 U.S. 472, 488, 99 S.Ct. 1304, 1312, 59 L.Ed.2d 519 (1979) explains:

> The choice among reasonable interpretations is for the Commissioner, not the courts.

Although readership costs may well contribute to taxable advertising income, AMA unquestionably incurs those costs to further AMA's *exempt* purpose.[9] That being so, Reg. (f) cannot be said to be unreasonable in treating such costs as not "directly connected with" an unrelated taxable business.[10] Nor is Reg. (f) unreasonable because it requires that costs incurred to further an exempt purpose be allocated first to any tax-exempt circulation income and only then (to the extent those costs exceed circulation income) to taxable advertising income. After all, every dollar (and not just a portion) of AMA's circulation income is tax-exempt and fully available to defray periodical costs.

In sum, this Court finds Reg. (f) is a reasonable implementation of Code

---

**8.** AMA Mem. 58 proposes this allocation of costs as the only "reasonable" one:

> Under this standard, costs of *JAMA* and *AM News* which are incurred solely for the purpose of producing advertising income should obviously be allocated entirely to such income, as provided in paragraph (f). Since the remaining costs of *JAMA* and *AM News* produce both advertising income and exempt income, a "reasonable basis" for allocating them is the ratio of the periodicals' advertising income to their exempt income.

AMA says that allocation is consistent with *Rensselaer's* construction of Reg. (c), which provides for the allocation of costs on a "reasonable basis" where facilities or personnel are used both for exempt and non-exempt purposes. *Rensselaer,* 732 F.2d at 1061–62 dealt with a tax-exempt school's use of a fieldhouse for both exempt student activities and non-exempt commercial activities and held certain indirect expenses (such as depreciation) should be allocated between the two uses based on the actual hours the facility was used for each use. Because readership content contributes to both tax-exempt income and taxable income, AMA would treat readership content like a facility that is "used" to produce both kinds of income. Thus AMA would allocate the costs of producing that readership content to both kinds of income based on the ratio of circulation income to advertising income. Of course *Rensselaer* is not directly apropos, because a mixed-purpose development of readership content does not lend itself to a neat division in the same way as the discrete use of an asset for one purpose, then another. And as the text of this opinion goes on to explain, IRS could rationally view the special benefits AMA derives from its tax-exempt status as justifying the seriatim, rather than ratable, allocation of readership costs.

**9.** Again it will be recalled that is the manner in which the term "readership costs" is employed in this opinion and—perhaps more important—that AMA acknowledges the accuracy of that stated purpose for incurring such costs.

**10.** Not surprisingly, AMA finds no fault with Reg. (f) when it classifies readership-content costs incurred to generate advertising income as fully-deductible "direct advertising costs" based on AMA's income-generating motivation—even though such costs may also have the effect of furthering AMA's exempt purpose by educating those who read the free periodicals. Nonetheless AMA asserts it is somehow unreasonable for Reg. (f) to look at the obverse side of the same coin as well—to take the identical intent-oriented approach in classifying readership-content costs *incurred to further AMA's exempt purpose*. As to those costs, AMA would ignore the lack of any income-generating motivation and allocate those costs based on the extent to which they *contributed* to advertising income. As is so often true, it seems to be a case of whose ox is being gored.

§ 512(a)(1). It is therefore a valid regulation, surviving AMA's attack.

## II. *Reg. (f)(4); Compliance with APA Notice Requirements*

 AMA fares better in its challenge of Reg. (f)(4), which sets out three methods for determining the amount of membership receipts to be allocated to the circulation income of a particular periodical ("allocable membership receipts"): [11]

1. the subscription price charged to nonmembers, if 20 percent or more of the total circulation of a periodical consists of sales to nonmembers ("Method 1"); or

2. the subscription price charged to members, if (a) Method 1 does not apply and (b) dues of 20 percent or more of the members are reduced because they do not receive a periodical ("Method 2"); or

3. a pro rata allocation of membership receipts (assigning to any specific periodical a portion of total membership receipts used for *all* exempt activities in proportion to the periodical's costs), if neither Method 1 nor Method 2 applies ("Method 3").

As Opinion at 1092 explained, allocable membership receipts represent members' "payments" through their dues, rather than by a separate subscription charge, for periodicals they receive.

AMA urges Reg. (f)(4) is invalid because it was promulgated without the notice required under APA § 553. Absent that "invalid" Reg. (f)(4), AMA asserts the remaining regulations (which in this instance means Reg. (f)(3)(iii)) supports AMA's refund claim.[12] This opinion treats first with the notice claim, then turns to the effect of AMA's success on that issue.

### A. *Notice*

 APA § 553 requires that notice of proposed rulemaking be published in the Federal Register 30 days before the adoption of a regulation, so that interested persons have the opportunity to submit their views or arguments about the proposed rule. Such notice must include (APA § 553(b)(3)):

> either the terms or substance of the proposed rule or a description of the subjects and issues involved.

"Proposed" Reg. (f)(4) was announced September 11, 1971 in a Notice of Proposed Rule Making (36 Fed.Reg. 18,316).[13] About four years later the final version of Reg. (f)(4) was adopted. AMA invokes *American Federation of Labor v. Donovan*, 757 F.2d 330, 338 (D.C.Cir.1985) (citations and footnotes omitted) to contend Reg. (f)(4) was adopted without notice because that regulation bears little resemblance to Proposed Reg. (f)(4):

> It is, of course, elementary that a final rule need not be identical to the original proposed rule. "The whole rationale of notice and comment rests on the expecta-

---

**11.** Because readership costs are deductible from advertising income only to the extent those costs exceed circulation income, and because allocable membership receipts are the largest component of circulation income, AMA necessarily benefits (as a tax matter) by any reduction in the calculation of allocable membership receipts.

**12.** By posing the issues in that manner, AMA avoids potential standing problems. Of course AMA cannot prove IRS' failure to comply with APA notice requirements resulted in the denial of a tax deduction: After all, even had AMA been given notice of Reg. (f)(4) and then criticized it in a comment, IRS could still have adopted the regulation in its current form and denied AMA the deduction. That being so, AMA would seem to be unable to satisfy two standing requirements:

1. injury (here the denial of a tax deduction) can be fairly traced to the challenged action (here the lack of notice); and
2. such injury is likely to be redressed by a favorable decision.

*Vickers v. Henry County Savings & Loan Ass'n*, 827 F.2d 228, 230–31 (7th Cir.1987). But AMA does not assert the lack of notice *caused* the erroneous denial of a deduction—only that the invalidation of Reg. (f)(4) renders IRS' calculation of AMA's taxes erroneous. AMA undoubtedly has standing to challenge the lack of notice as to Reg. (f)(4)—even apart from the refund claim—under APA § 702: AMA has been "adversely affected or aggrieved by agency action" because, had AMA been given the required notice, it would have had the opportunity to tender comments to, and perhaps influence, IRS.

**13.** Rather than quoting Proposed Reg. (f)(4) here, this opinion sets out that regulation in the Appendix.

tion that final rules will be somewhat different—and improved—from the rules originally proposed by the agency." ... However, "[w]here the change between the proposed and final rule is important, the question for the court is whether the final rule is a 'logical outgrowth' of the rulemaking proceeding." ... [I]f the final rule deviates too sharply from the proposal, the affected parties will be deprived of notice and an opportunity to respond to the proposal."

See also *Chocolate Manufacturers Association v. Block*, 755 F.2d 1098, 1105 (4th Cir.1985) and cases cited there.

Comparison of Proposed Reg. (f)(4) with the ultimately adopted version reveals IRS grossly oversimplified matters when it summarized the changes in Reg. (f)(4) this way (40 Fed.Reg. at 58,638):

> The notice of proposed rulemaking set forth seven factors to be used in making this [membership receipts] allocation. The amendments adopted by this document simplify the allocation rule by reducing the factors to three: (1) subscription price charged to nonmembers; (2) subscription price charged to members and; (3) pro rata allocation of membership receipts based upon cost.

For one thing, AMA Supp. Mem. 10 is quite correct in saying Proposed Reg. (f)(4) provided for a "flexible, case-by-case approach" to determining allocable membership receipts, identifying various *factors to consider* in making that determination.[14] In contrast Reg. (f)(4) sets out three specific *methods* of actually calculating allocable membership receipts, each applicable to a specific factual matrix. For example, under Proposed Reg. (f)(4) the "subscription price charged to nonmembers" was simply to be "accorded greater weight than any other factor" where sales to nonmembers represent 20 percent or more of total circulation. Reg. (f)(4)'s Method 1 makes that factor the sole determinant under such circumstances, stating the price charged to nonmembers "shall determine the price"

for purposes of calculating allocable membership receipts.

To be sure, sales of *JAMA* and *AM News* to nonmembers did *not* represent at least 20 percent of total circulation, thus rendering Method 1 inapplicable. Nor were the dues of 20 percent or more of AMA's members reduced because they did not receive those periodicals (Method 2). Allocable membership receipts for those periodicals were therefore calculated according to Method 3's pro rata formula. But had Proposed Reg. (f)(4) been adopted, the amount derived from that pro rata formula would not have been conclusive—instead, it would simply have provided "some indication of the amount of allocable membership receipts...."

AMA R. Mem. 5 highlights a second and equally important deviation between the proposed and adopted versions of the regulation. Proposed Reg. (f)(4)'s factor 3 ("Subscription price of comparable periodicals of taxable organizations"), which was not included in the ultimate Reg. (f)(4), had expressly provided:

> The fact that a taxable organization issues a periodical which is comparable to an exempt organization periodical and makes a practice of distributing substantially all of its circulation at no charge is substantial evidence that none of the membership receipts of the exempt organization are allocable to its periodical.

As construed in Opinion at 1097–98, Reg. (f)(4) does not take that fact into consideration at all: As long as AMA charged for a periodical (through dues) and thus may be considered as having derived income from distributing it, Reg. (f)(4) requires the consideration of such income in determining that periodical's circulation income.

Thus Reg. (f)(4) takes an entirely different approach to the determination of allocable membership receipts than did Proposed Reg. (f)(4). Because Reg. (f)(4) deviated so drastically from Proposed Reg. (f)(4), and because it was issued without any separate

---

**14.** Indeed, the proposed regulation preceded the listing of those factors with the classic lawyers' hedging language (emphasis added):

The factors used in determining such proper allocation include *but are not limited to* the following:

notice of those highly material proposed deviations, this Court finds Reg. (f)(4) was promulgated without the required notice under APA § 553 and is therefore invalid.

B. *Effect of Invalid Reg. (f)(4) on AMA's Refund Claim*

■ That is not the end of the story (as AMA would have it), for this opinion must next determine how that invalidity of Reg. (f)(4) impacts on AMA's refund claim. AMA Supp. Mem. 12 says that in the absence of Reg. (f)(4) the only test for determining allocable membership receipts is that provided in Reg. (f)(3)(iii), which reads (in part):

Allocable membership receipts is the amount which would have been charged and paid if—

(a) The periodical was that of a taxable organization,

(b) The periodical was published for profit, and

(c) The member was an unrelated party dealing with the taxable organization at arm's length.

AMA Supp. Mem. 11 n. 4 says that language teaches this:

The plain object of the "hypothetical taxable publisher" test for determining "circulation income" in subparagraph (f)(3)(iii) is to disregard sources of income available to exempt publishers attributable to their exempt activities that are not also available to commercial publishers.

From that premise AMA Mem. 57–58 reasons that allocable membership receipts are calculated for *JAMA* and *AM News* under the Reg. (f)(3)(iii) "test" by determining how much circulation income a commercial publisher would have received for distributing those periodicals. Then, applying that test, AMA Mem. 58 (emphasis added) concludes:

As shown by the testimony of Prof. Wecker, a taxable organization publishing *JAMA* and *AM News* would have received total subscription income in an amount not much greater than what the AMA in fact received from nonmembers. Thus little or no membership receipts should be allocated to "circulation income." This is precisely the result that would have been reached under [Proposed Reg.] (f)(4) before it was amended so drastically without notice. Because "circulation income" so determined is lower than that reported by the AMA in the returns upon which its claims for refund are based,[15] the AMA's claims with respect to *JAMA* and *AM News* must be allowed in full.

But AMA is obviously wrong in its notion that Reg. (f)(3)(iii), read *independently* of Reg. (f)(4), provides a meaningful standard (much less an actual test) for determining allocable membership receipts. Reg. (f)(3)(iii) is simply not a self-contained regulation: Immediately after its language on which AMA relies (the single sentence quoted at the beginning of this section B of this opinion), the regulation says:

See [Reg. (f)(4)] for a discussion of the factors to be considered in determining allocable membership receipts of an exempt organization periodical under the standard described in the preceding sentence.

In other words, Reg. (f)(3)(iii) simply provides a generalized standard and then goes on to instruct how that standard is to be reduced to practice—hence the regulation's specific cross-reference to Reg. (f)(4).

That being so, even the meaning of the "standard" in Reg. (f)(3)(iii) is not fairly ascertainable except by construing that regulation in conjunction with the implementation provisions in Reg. (f)(4). From the start AMA has failed to recognize that, preferring instead to ignore the specific Reg. (f)(3)(iii) cross-reference to Reg. (f)(4). By thus construing Reg. (f)(3)(iii) in isolation, AMA has managed to read that reg-

---

**15.** [Footnote by this Court] According to AMA, its control-group members' dues (and not *all* membership dues) were excludable from total membership receipts in the allocation of membership receipts to circulation income under Method 3. Opinion at 1098 concluded IRS had correctly construed Reg. (f)(4)(iii) as requiring the inclusion even of those dues and therefore denied that part of AMA's refund claim.

ulation in a way that renders it inconsistent with its own implementation provisions (and thus internally inconsistent). For example, AMA R. Mem. 5 said Reg. (f)(3) retained the "overall flexible approach" of the proposed regulations while Reg. (f)(4) did not. In the same vein, AMA Supp. Mem. 11 now says:

> The mechanical allocation "factor" of (f)(4)(iii) is not entirely consistent with the more flexible and case-sensitive standard set forth in (f)(3)(iii)....[16]

That is plainly absurd, because Reg. (f)(3)(iii) itself requires implementation of its "standard" according to what AMA disparagingly labels the "mechanical allocation" methods in Reg. (f)(4). For precisely that reason, Opinion at 1098 rejected AMA's interpretation of the standard in Reg. (f)(3)(iii) and instead construed that language consistently with Reg. (f)(4). That led the Opinion to reach a conclusion entirely different from that advanced by AMA as to the meaning of the standard in Reg. (f)(3)(iii).[17]

But now Reg. (f)(4) has been invalidated, leaving a gap in the regulations: Reg. (f)(3)(iii) provides a standard, but it refers to a now-nonexistent regulation for instructions as to how to implement the standard. This Court cannot perform such major judicial surgery at AMA's request, by excising the reference to Reg. (f)(4) and reading Reg. (f)(3)(iii) as though it were intended to stand alone (as it clearly is not).[18] And that in turn means this Court cannot fairly determine whether or not IRS was reasonable in calculating allocable membership receipts for *JAMA* and *AM News*.

On the other hand, this Court also cannot wholly ignore the APA-violative irregularity in promulgation of Reg. (f)(4). Were that to be done, APA § 553 could be ignored at will, and the entire purpose of APA could be flouted.

One solution avoids both those unwholesome results. This action is stayed until a regulation can be promulgated that fills the gap created by the invalidation of Reg. (f)(4).[19] Only then will this Court be in a

---

**16.** [Footnote by this Court] AMA appears to have construed Reg. (f)(3)(iii) consistently with the implementation provisions in *Proposed* Reg. (f)(4), even though those provisions were never adopted. Of course there is no warrant for that approach at all.

**17.** As the text suggests, Opinion at 1098 took the regulations at face value, reading the Reg. (f)(3)(iii) standard in conjunction with the Reg. (f)(4) implementation provisions designed to implement that standard. In summary that produced these results:

1. To the extent AMA receives payment (through dues) for distributing periodicals, AMA is comparable to a commercial publisher who is paid for such distribution.

2. Consequently the "standard" in Reg. (f)(3)(iii) refers only to the question of *how much* a commercial publisher would in fact charge for the periodical—it is a given that a *comparable* commercial publisher would in fact charge for those periodicals.

3. As to *JAMA* and *AM News,* the amount a commercial publisher would charge is determined under Method 3 by assigning to each periodical a portion of total membership receipts used for all exempt activities in proportion to that periodical's costs.

4. Accordingly the determination of AMA periodicals' circulation income under Reg. (f)(3)(iii) requires consideration of AMA income derived from the distribution of its peri-

odicals (through dues) even if commercial publishers would derive no income from such distribution.

AMA Supp. Mem. 11 wholly misconstrues the Opinion, saying this Court refused to apply Reg. (f)(3)(iii)'s standard and instead chose to implement Reg. (f)(4). That is nonsense so long as Reg. (f)(4) enters into the analysis at all. What this Court did was to refuse to apply the Reg. (f)(3)(iii) standard *as AMA had construed it,* because that construction totally ignored the regulation's cross-reference to the implementation provisions in Reg. (f)(4).

**18.** AMA would treat Reg. (f)(4) as though it were the regulatory equivalent of the vermiform appendix, whose removal leaves the body of the regulations as well off post-surgery as it was before. But it is for IRS, not AMA (or for that matter this Court), to determine whether the regulatory general standard is to be fleshed out by such implementing instructions—whether the excised part is purely vestigial (performing no useful function) or is rather a vital organ.

**19.** Plainly AMA's refund claim could not be *granted* under the present circumstances. That being so, this Court has concluded a stay is appropriate, to avoid any possible limitations problems that the alternative of *dismissing* the claim might present (it should be remembered this is a suit against the sovereign, maintainable only as the sovereign has consented).

position to decide whether AMA is entitled to the remainder of its refund claim.[20]

\* \* \*

In summary:

1. Reg. (f) is not inconsistent with Code § 512(a)(1) and is therefore valid (except as next noted).

2. Reg. (f)(4) was promulgated without notice in violation of APA § 553. It is therefore invalid.

3. This action is stayed until a regulation is promulgated that fills the gap created by the invalidation of Reg. (f)(4). At that point this Court will determine whether AMA is entitled to a tax refund because IRS improperly calculated allocable membership receipts for *JAMA* and *AM News*.

This action is set for a status hearing September 14, 1987 at 9 a.m., when counsel are directed to report on the anticipated future conduct of this litigation.

### APPENDIX

### PROPOSED RULE MAKING

(4) *Allocable membership receipts.* In determining the allocable membership receipts of an exempt organization periodical all the facts and circumstances involved in each case shall be considered. However, in cases where the factors described in subdivision (i) or (ii) of this subparagraph are significant, or in cases where the factor described in subdivision (iii) of this subparagraph exists, such determination shall be based solely upon the application of all of such factors that do exist. In cases where the preceding sentence does not apply all factors, including (but not limited to) the factors contained in subdivisions (iv) through (vii) of this subparagraph, shall be considered in determining allocable membership receipts. In order to avoid distortions which may arise from consideration of the facts and circumstances for only the taxable year, due regard shall be given to the facts and circumstances, including the application of all relevant factors for all preceding years. The factors used in determining such proper allocation include but are not limited to the following:

(i) *Subscription price charged to nonmembers.* The subscription price charged to nonmembers will be accorded greater weight than any other factor in determining allocable membership receipts where there are significant sales to nonmembers. Sales to nonmembers are significant if the circulation represented by such sales constitutes 20 percent or more of total circulation. Where sales to nonmembers constitute less than 20 percent of total circulation, this factor will not be given greater weight than any other factor and will be given progressively less weight in proportion to the degree that sales to nonmembers are less than 20 percent of total circulation.

(ii) *Subscription price to members.* If membership receipts from a significant percentage of members of an exempt organization are less than those received from the other members because such significant percentage of members do not receive the periodical, such factor shall be given greater weight than the factor described in subdivision (iii) of this subparagraph but less weight than the factor described in subdivision (i) of this subparagraph in determining allocable membership receipts of the organization. Except as provided in the preceding sentence, the subscription price established by the organization for members will otherwise be given relatively little weight. For purposes of this subdivision, the percentage of members not receiving the periodical will be deemed signifi-

---

**20.** This opinion has not referred to the government's supplemental memorandum for the best of reasons: That memorandum contains a single argument (consisting of four sentences) that betrays a total misunderstanding of the issues (Govt. Supp. Mem. 5–6):

Therefore, the AMA journals are only comparable to a commercial publication which compels certain subscribers to pay a given price for its publications. Since there is no evidence that the comparable periodicals compel anyone to pay for their subscriptions as, in effect, the AMA does, the test in the proposed (1971) regulation would not be applicable even if it had gone into effect. In this respect, the AMA cannot be compared with taxable publishers. The question therefore of whether proper procedure under the APA was followed in promulgating the regulations is moot.

cant only if it represents 20 percent or more of the total number of members. This factor will be given progressively greater weight as such percentage increases. On the other hand, this factor will be given relatively little weight, if any, if substantially all the members receive the periodical. Further, this factor will be given relatively little weight, in any event, if its use alone would result in the total deductions attributable to the periodical consistently exceeding the total income attributable to the periodical.

(iii) *Subscription price of comparable periodicals of taxable organizations.* The subscription price of a periodical published by a taxable organization will be given weight, but less weight than the factors described in subdivisions (i) and (ii) of this subparagraph, in determining allocable membership receipts of an exempt organization if such periodical is comparable to the exempt organization periodical. Periodicals are comparable only if the physical characteristics, the editorial content, and the advertising contained in both periodicals are substantially similar in content and amount. The fact that a taxable organization issues a periodical which is comparable to an exempt organization periodical and makes a practice of distributing substantially all of its circulation at no charge is substantial evidence that none of the membership receipts of the exempt organization are allocable to its periodical.

(iv) *Rate of return.* A determination of the amount which the exempt organization would be required to charge as a subscription price in order that the total income attributable to the periodical would produce a reasonable rate of return on the organization's investment in such periodical is relevant in determining allocable membership receipts. In other words, once an amount equal to a reasonable return on the investment is determined, circulation income might roughly correspond to the excess of such amount plus total periodical costs over gross advertising income. The amount of a reasonable rate of return on the organization's investment and the reliability of an allocation based upon such a figure depends upon such considerations as whether the organization is reasonably efficient, whether its total costs are reasonable, the degree of risk assumed, whether general economic considerations indicate that such an activity might produce such a reasonable rate of return, and other similar considerations. In addition, this figure should be compared with the amounts obtained by evaluation of all other facts and circumstances.

(v) *Relationship of revenues from sales of periodicals of taxable organizations to revenues from sales of advertising.* Where one or more taxable organizations issue periodicals which are similar to an exempt organization periodical (but not comparable within the meaning of subdivision (iii) of this subparagraph), the relationship of revenues from the sales of such periodicals to revenues from the sale of advertising in such periodicals is of some assistance in determining allocable membership receipts of the exempt organization. For example, if it appears that similar taxable periodicals derive one-half as much income from sales of the periodical as from sale of advertising in the periodical, this is some indication that the exempt organization's circulation income might roughly correspond to an amount equal to one-half of the gross advertising income derived by the periodical. However, this factor could seldom, if ever, be used alone to determine allocable membership receipts, and is only to be used together with other factors in making this determination.

(vi) *Relationship of revenues from sales of periodicals of taxable organizations to total periodical costs.* Where one or more taxable organizations issue periodicals which are similar to an exempt organization periodical (but not comparable within the meaning of subdivision (iii) of this subparagraph), the relationship of revenues from sales of periodicals to total periodical costs of such periodicals is of some assistance in determining allocable membership receipts of the organization. For example, if it appears that similar periodicals derive from sales of the periodical an amount equal to one-fourth of their total periodical costs, this is some indication that the ex-

empt organization's circulation income might roughly correspond to an amount equal to one-fourth of its total periodical costs. However, this factor could seldom, if ever, be used alone to determine allocable membership receipts, and is only to be used together with other factors in making this determination.

(vii) *Pro rata allocation of membership receipts.* Since it may generally be assumed, absent indications to the contrary, that membership receipts and gross advertising income are equally available for all the exempt activities (including the periodical) of the organization, the relationship of total periodical costs to the sum of such total and the costs of other exempt activities is some indication of the amount of allocable membership receipts of the exempt organization. For example, assume that an exempt organization's total exempt activities costs are $100,000, of which $30,000 are the total periodical costs. Further assume that the membership receipts of this organization are $60,000. Under these circumstances, it could be determined that 30 percent ($30,000/$100,000) of the membership receipts are allocable to the publication, so that allocable membership receipts might be found to be $18,000 (30 percent of $60,000). In some cases, as a result of an organization setting aside funds in its exempt activities, or using borrowed funds or funds previously set aside in such activities, it may be difficult to determine the total costs for the period. As a consequence, since the aggregate of membership receipts, receipts from non-members, and gross advertising income is generally devoted to defraying total periodical costs plus other exempt costs of the organization, it may be necessary in some cases to consider the relationship of total periodical costs to such aggregate income in determining allocable membership receipts. For example, assume that an exempt organization's aggregate income consists of $90,000 from membership receipts and $30,000 from advertising. Its total periodical costs are $60,000 and its exempt activities costs (other than readership costs of the periodical) are $130,000, which are financed in part with borrowed funds. Un-

der these circumstances, the relationship of total periodical costs ($60,000) to aggregate income ($120,000), or 50 percent, is some indication that $45,000 of the membership receipts (50 percent of $90,000) constitutes allocable membership receipts.