AMERICAN MEDICAL ASSOCIATION, Plaintiff–Appellee, Cross–Appellant,

v.

UNITED STATES of America, Defendant–Appellant, Cross–Appellee.

Nos. 88–3012, 88–3086.

United States Court of Appeals, Seventh Circuit.

Argued June 6, 1989.

Decided Oct. 12, 1989.

---

George A. Platz, Michael L. Schultz, Frank V. Battle, Jr., Sidley & Austin, Chicago, Ill., for American Medical Ass'n.

Gary R. Allen, William S. Rose, Jr., Asst. Atty. Gen., Dept. of Justice, Tax Div., Appellate Section, Washington, D.C., Eileen M. Marutzky, Asst. U.S. Atty., Chicago, Ill., Robert S. Pomerance, David M. Moore, Thomas R. Jones, Dept. of Justice, Tax Div., Robert A. Saltzstein, Joseph J. Saunders, Stephen M. Feldman, Washington, D.C., for U.S.

Before CUDAHY, MANION and KANNE, Circuit Judges.

CUDAHY, Circuit Judge.

This case involves the allocation of income and expenses between a charitable organization's tax-exempt activities and its taxable business endeavors for purposes of computing the charity's "unrelated business income tax" under 26 U.S.C. sections 511 to 513. The American Medical Association (the "AMA"), a tax-exempt charitable organization, filed suit in the Northern District of Illinois seeking a refund for the tax years 1975 through 1978. The AMA argued that the Internal Revenue Service (the "IRS") had improperly calculated its income from the non-exempt unrelated business of publishing advertising in the organization's publications. In a series of opinions, reported at 668 F.Supp. 1085 (1987), 668 F.Supp. 1101 (1987), 688 F.Supp. 358 (1988) and 691 F.Supp. 1170 (1988), the district court substantially agreed with the AMA's statutory and regulatory arguments, and ordered the United States to pay the AMA the full amount of the refund requested. We affirm in part and reverse in part.

I.

The AMA is a tax-exempt membership organization under section 501(c)(6) of the Internal Revenue Code.[1] Its charitable function is "to promote the science and art of medicine and the betterment of public health." In aid of this purpose the AMA publishes the *Journal of the American Medical Association* ("JAMA") and the *American Medical News* ("AM News"). Most of the AMA's members pay annual dues to belong to the organization. Between 1975 and 1978, AMA members received JAMA and AM News at no additional cost as a benefit of membership.

JAMA and AM News both contain articles of relevance to the practice of medicine. But the journals also contain paid advertising. During the relevant period the AMA sent complimentary copies of JAMA and AM News to targeted groups of physicians who make up an especially desirable audience for firms likely to advertise in the journals. The parties stipulated that the AMA's sole purpose in engaging in this complimentary "controlled circulation" was to increase advertising revenues. Many of the AMA's dues-paying members were also on the controlled circulation list and therefore would have been entitled to receive JAMA and AM News even if they were not AMA members. However, the AMA apparently did not inform these physicians that they were entitled to complimentary copies of the journals. Nor did the AMA refund any portion of these physicians' membership dues in recognition of the fact that they need not have paid for the periodicals.

Between 1975 and 1978, the AMA placed a portion of the membership dues it received in an "association equity" account, which was intended to serve as a reserve fund to offset any deficit which might occur in future years if the association's revenues were insufficient to cover expenses. The amounts deposited in the association equity account remained on the AMA's books as a reserve until 1985, when the AMA withdrew some of these funds to compensate for a shortfall in its revenue.

There is no dispute that the editorial or readership content of the two periodicals furthers the AMA's charitable mission, and

---

1. Although the provisions of the tax laws relevant to this appeal were not substantially altered by the 1986 Tax Reform Act, all references in this opinion are to the (now-superseded) Internal Revenue Code of 1954 as amended, 26 U.S.C.

therefore any revenue attributable to the publication and distribution of articles in JAMA and AM News is exempt from taxation. And the AMA has admitted that the advertising in JAMA and AM News is a business endeavor unrelated to the AMA's charitable purpose, and is therefore taxable. This case presents several questions involving the allocation of income and expenses between the exempt and taxable aspects of JAMA and AM News, and the allocation of membership dues between these periodicals and the AMA's other (exempt) activities.

The statutory scheme applicable to these journals is fairly straightforward. Section 511 of the Code provides that the "unrelated business taxable income" of a charitable organization is subject to the tax applied to corporate income under section 11. Section 512(a)(1) defines "unrelated business taxable income" as

the gross income derived by any organization from any unrelated trade or business (as defined in section 513) regularly carried on by it, *less the deductions* allowed by this chapter *which are directly connected with the carrying on of such trade or business....*

(emphasis added). Finally, section 513(a) defines an "unrelated trade or business" as

any trade or business the conduct of which is not substantially related (aside from the need of such organization for income or funds or the use it makes of the profits derived) to the exercise or performance by such organization of its charitable ... purpose or function constituting the basis for its exemption under section 501....

In a provision added in 1969, and significantly titled "Advertising, etc., activities," section 513(c) further explains:

the term "trade or business" includes any activity which is carried on for the production of income from the sale of goods or the performance of services. For purposes of the preceding sentence, an activity does not lose identity as a trade or business merely because it is carried on within a larger aggregate of similar activities or within a larger com-

plex of other endeavors which may, or may not, be related to the exempt purposes of the organization.

The Supreme Court construed these provisions in *United States v. American College of Physicians*, 475 U.S. 834, 106 S.Ct. 1591, 89 L.Ed.2d 841 (1986). *American College* involved a charitable organization's medical journal which, as here, contained both articles which furthered the organization's exempt function and paid advertisements. The Supreme Court held that section 513(c) clearly indicated Congress' intent to treat advertising in an otherwise tax-exempt publication as a separate "trade or business," which may be taxable if the "conduct of [the advertising business] is not substantially related ... to the ... performance by such organization of its charitable ... purpose." *Id.* at 839–40, 106 S.Ct. at 1594–95. To determine whether the advertising content of a journal is "substantially related" to the organization's educational mission, the IRS must look to the manner in which the advertising is selected and displayed; *i.e.*, whether only advertising of new technologies or medications is allowed, whether the charity coordinates the subject matter and content of the ads, etc. *Id.* at 848–50, 106 S.Ct. at 1599–1600. The organization's tax exemption extends to its publication of advertising only if the advertisements "contribute[ ] importantly" to the charity's exempt purpose. *Id.* at 847, 106 S.Ct. at 1599; *see also United States v. American Bar Endowment*, 477 U.S. 105, 109–16, 106 S.Ct. 2426, 2429–32, 91 L.Ed.2d 89 (1986).

*American College* specifically endorsed the so-called "fragmentation" principle, whereby a charitable organization's publications are divided into two components: (1) the tax-exempt publication of the journal's "editorial" or "readership content"; and (2) the taxable enterprise of selling and publishing advertising. The United States and the AMA agree on these general principles; in fact, the AMA has even conceded that the advertisements in JAMA and AM News are not "substantially related" to the AMA's educational mission, and therefore constitute an "unrelated" business under

*American College.* The parties' disagreement centers on the application of the "fragmentation" principle to the facts of this case.

The IRS has adopted detailed regulations which govern the allocation of revenues and expenses between a journal's exempt editorial and non-exempt advertising activities. Regulation 1.512(a)–1(f)(6) provides for division of a periodical's costs into two categories:

> (ii)(a) The direct advertising costs of an exempt organization periodical include all expenses, depreciation and similar items of deduction which are directly connected with the sale and publication of advertising.... The items allowable as deductions under this subdivision do not include any items of deduction attributable to the production or distribution of the readership content of the periodical.

> .    .    .    .    .

> (iii) The "readership" costs of an exempt organization periodical include expenses, depreciation or similar items which are directly connected with the production and distribution of the readership content of the periodical.... [R]eadership costs include all the items of deduction attributable to an exempt organization periodical which are not allocated to direct advertising costs under subdivision (ii) ...

26 C.F.R. § 1.512(a)–1(f)(6). "Direct advertising costs" are fully deductible from gross advertising income, Reg. (f)(2)(i); "readership costs" are only deductible from gross advertising income to the extent they exceed circulation income. Reg. (f)(2)(ii)(b). "Circulation income," in turn, is defined as

> the income attributable to the production, distribution or circulation of a periodical (other than gross advertising income).... Where the right to receive an exempt organization periodical is associated with membership ... in such organization for which dues ... are received (hereinafter referred to as "membership receipts"), circulation income includes the portion of such membership receipts allo-

cable to the periodical (hereinafter referred to as "allocable membership receipts").

Reg. 1.512(a)–1(f)(3)(iii). Regulation (f)(3)(iii) goes on to explain that "allocable membership receipts" should generally represent the amount which a taxable organization would have charged for the periodical in an arms-length transaction with the member. The regulation refers taxpayers to regulation (f)(4) "for a discussion of the factors to be considered in determining allocable membership receipts." Regulation (f)(4) provides three methods for determining the share of membership receipts which should be deemed to constitute a member's payment for the right to receive the periodical. Only the third method of calculating allocable membership receipts is applicable to JAMA and AM News. That method is described as a "pro rata allocation."

> Since it may generally be assumed that membership receipts and gross advertising income are equally available for all of the exempt activities (including the periodical) of the organization, the share of membership receipts allocated to the periodical, where [methods 1 and 2] do not apply, shall be an amount equal to the organization's membership receipts multiplied by a fraction the numerator of which is the total periodical costs and the denominator of which is such costs plus the costs of other exempt activities of the organization.

Reg. 1.512(a)–1(f)(4)(iii). Therefore, the amount of dues to be allocated to circulation income under the pro rata allocation method equals total membership receipts multiplied by the ratio of total periodical costs to the costs of all exempt activities.

The AMA raises a number of challenges to the validity of these allocation rules, and to the IRS's application of these principles in this case. However, before discussing the AMA's arguments in detail, it is worth noting that the AMA's goal throughout this litigation has been to reduce, to the maximum extent allowable, its tax liability from its "unrelated" advertising business.[2]

---

**2.** Of course the AMA is entitled to seek to mini-    mize its tax liability to the fullest extent permit-

Therefore, the AMA would like to decrease the amount of its (taxable) advertising income by *increasing* the expenses (labelled "direct advertising costs") which are fully deductible from advertising income. And, since any loss attributable to the readership content of JAMA and AM News is also deductible from advertising income (in something of a departure from strict application of the "fragmentation" principle), the AMA is also interested in producing a loss on the readership side of the journals. Such a loss may be created, in part, by decreasing the amount of circulation income derived through the allocation of membership dues to circulation income in the form of a hypothetical subscription price which members pay (as part of their total membership dues) for the right to receive the journals.

The AMA argues, most generally, that the allocation regulations are invalid because the IRS did not comply with the notice and comment requirements of the Administrative Procedure Act (the "APA") in promulgating the rules. In the alternative, the AMA urges that the regulations are invalid because they conflict with the statutory provisions governing the unrelated business income tax.

The AMA also makes a series of fact-specific arguments. First, it argues that membership dues which were placed in the "association equity" reserve account, and which were not employed to cover current expenses in the tax years in question, should not have been included in "membership receipts" for the purpose of determining the allocation of membership dues to circulation income. The AMA's next two arguments relate to its practice of distributing complimentary copies of JAMA and AM News as part of its "controlled circulation." The AMA argues, first, that the cost of producing the articles in these complimentary copies (which would normally be considered "readership costs" and deductible only from tax-exempt circulation income) should be considered "direct advertising costs" since the AMA's sole purpose

in distributing these copies was to promote its advertising business. Second, the AMA argues that the dues of physicians who were AMA members, but who were entitled to receive the journals anyway due to their membership in the control groups, should not be included in allocable membership receipts, since it is absurd to suggest that these physicians paid for a journal which they would have received free of charge in any case.

The district court accepted the AMA's arguments in substantial part. In its first opinion, the court held that the costs of producing the editorial content of journals distributed free of charge to promote the AMA's advertising business were "direct advertising costs" directly deductible from advertising income. 668 F.Supp. 1085, 1094–96 (N.D.Ill.1987). The court also ruled that the dues placed in the AMA's "association equity" account should not have been considered current membership receipts, and therefore no portion of these payments should have been allocated to circulation income in the year received. *Id.* at 1096–97. Finally, the court ruled, contrary to the AMA view, that the dues received from AMA members who were also members of the control group were to be included in the dues allocated to circulation income. *Id.* at 1097–98.

The court's second opinion rejected the AMA's argument that the allocation rules were inconsistent with the governing provisions of the tax code. 668 F.Supp. 1101, 1102–04 (N.D.Ill.1987). However, the court found the regulations invalid because their promulgation did not comply with the notice requirements of the APA, since the final allocation rules adopted "an entirely different approach to the determination of allocable membership receipts" than the initial proposal. *Id.* at 1104–06. Since the court concluded that it was impossible to determine the AMA's tax liability without the benefit of any (valid) allocation rules, the action was stayed to allow the IRS to promulgate new allocation rules in a man-

ted by law. *Gregory v. Helvering,* 293 U.S. 465, 468–69, 55 S.Ct. 266, 267, 79 L.Ed. 596 (1935), *aff'g,* 69 F.2d 809, 810 (2d Cir.1934) (L. Hand,

J.); *Yosha v. Commissioner,* 861 F.2d 494, 497 (7th Cir.1988).

ner consistent with the APA. *Id.* at 1107–08.

The district court's third opinion, 688 F.Supp. 358 (N.D.Ill.1988), rejected the Government's petition for reconsideration of the court's APA ruling. The court held that the Government had waived the argument that the allocation rules were not subject to the notice-and-comment provisions of the APA since the rules were "interpretative," rather than "legislative." *See* 5 U.S.C. § 553(b)(A), (d)(2). Following this rebuff the Government refused to re-promulgate the allocation rules. Therefore, in its fourth opinion, the court granted the AMA a refund in the full amount requested in the complaint. 691 F.Supp. 1170 (N.D.Ill.1988).

## II.

The AMA argues most generally that the rules governing the allocation of a portion of membership dues receipts to circulation income are invalid because the public did not receive adequate notice of the IRS's regulatory intentions before the final rules were issued. The AMA contends that the inadequate notice violated section 553(b)(3) of the APA, which requires an agency proposing a new rule to include in the notice of proposed rulemaking (the "NPR") "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3).

The allocation rule finally adopted, see 26 C.F.R. § 1.512(a)–1(f)(4), provides three methods for determining the portion of membership dues which will be allocated to circulation income. (In essence, these allocation rules are meant to determine a hypothetical subscription price which members of a charitable organization pay for the organization's journals as part of their single, undivided dues payment.) First, if 20% or more of the journal's circulation consists of sales to nonmembers, then this arms-length sale price is deemed to be the price

paid by members. Reg. (f)(4)(i). If this first method does not apply, and 20% or more of the association's members elect not to receive the journal in exchange for a reduction in their dues assessment, the amount of the dues reduction is determined to be the imputed price of the journal to members who receive it. Reg. (f)(4)(ii). Finally, if these two allocation methods are inapplicable, the allocable portion of membership dues is calculated by determining the ratio of the association's costs for producing the journal in relation to the cost of all of the association's exempt activities. The regulation then prescribes that allocable membership dues bear the same relationship to total dues receipts as the proportion of the costs of the journal to the cost of all activities. This is the "pro rata allocation method" of regulation (f)(4)(iii).[3] These three allocation rules are apparently the exclusive methods of determining allocable membership receipts under the final rule.

In contrast to the ironclad, exhaustive methodology of the final version, the proposed allocation rule enumerated seven *factors* which would be *considered* in allocating dues receipts to circulation income. 36 Fed.Reg. 18,316, 18,318–20 (1971). The NPR specifically stated that other factors beyond those mentioned would be considered where appropriate. *Id.* at 18,318. Moreover, the third of the seven factors listed in the proposed rule provided that:

> The fact that a taxable organization issues a periodical which is comparable to an exempt organization periodical and makes a practice of distributing substantially all of its circulation at no charge is substantial evidence that none of the membership receipts of the exempt organization are allocable to its periodical.

*Id.* The AMA believes that this (never-promulgated) provision would have permitted it to allocate no membership receipts to

---

**3.** A simple hypothetical may clarify our rather unwieldy verbal statement of this third allocation method. Assume a tax-exempt organization receives a total of $200 in dues revenues. The association's journal costs $30 to produce; the total cost of producing all of the associa-

tion's exempt activities (including the journal) is $150. Therefore, the cost of the journal is one-fifth of the total activity costs. Under the pro rata allocation method, one-fifth of membership receipts, or $40, would be allocated to circulation income.

circulation income, since the AMA's taxable competitors distribute most of their periodicals through complimentary controlled circulation. However, under the final rule's pro rata allocation method, the IRS allocated approximately $33 per member, or almost $6 million, to circulation income.

The district court concluded that the final rule adopted "an entirely different approach to the determination of allocable membership receipts" and "deviated so drastically" from the NPR that the final rule was invalid due to the inadequacy of the notice of the terms of the final rule. 668 F.Supp. at 1105–06. We agree with the district court that the final rule indeed worked a substantial change to the NPR: gone is the flexible, case-by-case "totality of the circumstances" approach of the original proposal; in its stead the IRS has substituted a limited set of precise rules which must be applied in all cases. But we do not agree with the district court's holding that this change in approach (which was occasioned by the numerous criticisms of the NPR's vagueness and malleability) renders the rule invalid under the APA.

■ Two types of notice of proposed rules are authorized by section 553: either notice which specifies the "terms or substance" of the contemplated regulation or notice which merely identifies the "subjects and issues involved" in the rulemaking proceeding inaugurated by the notice. Thus the statutory language makes clear that the notice need not identify every precise proposal which the agency may ultimately adopt; notice is adequate if it apprises interested parties of the issues to be addressed in the rule-making proceeding with sufficient clarity and specificity to allow them to participate in the rulemaking in a meaningful and informed manner.[4] Stated another way, a final rule is not invalid for lack of adequate notice if the rule finally adopted is "a logical outgrowth" of the original proposal.[5]

■ That an agency changes its approach to the difficult problems it must address does not signify the failure of the administrative process. Instead, an agency's change of course, so long as generally consistent with the tenor of its original proposals, indicates that the agency treats the notice-and-comment process seriously, and is willing to modify its position where the public's reaction persuades the agency that its initial regulatory suggestions were flawed.[6] As Judge Leventhal explained,

[t]he requirement of submission of a proposed rule for comment does not automatically generate a new opportunity for comment merely because the rule promulgated by the agency differs from the

---

4. The legislative history of the APA makes this point quite explicitly. *See* S.Rep. No. 752, 79th Cong., 1st Sess. 14 (1945) ("Agency notice must be sufficient to fairly apprise interested parties of the issues involved."), *reprinted in* Senate Judiciary Comm., *Administrative Procedure Act: Legislative History*, 187, 200 (Comm. Print 1946) ("*Legislative History*"); H.Rep. No. 1980, 79th Cong., 2d Sess. 24 (1946), *reprinted in Legislative History* 235, 258. The *Attorney General's Manual on the Administrative Procedure Act* (1947), often considered an especially persuasive aid to interpretation of the APA, also noted that, even where the agency *could* publish the specific wording of a proposed rule, it was still permissible to publish instead "a more general 'description of the subjects and issues involved.'" *Id.* at 29. For a sampling of the cases which have held that an agency need not publish in an NPR the precise terms of a rule finally adopted, see *Chocolate Mfrs. Ass'n v. Block,* 755 F.2d 1098, 1104 (4th Cir.1985); *American Transfer & Storage Co. v. ICC,* 719 F.2d 1283, 1303 (5th Cir. 1983); *Sierra Club v. Costle,* 657 F.2d 298, 352 (D.C.Cir.1981); *Daniel Int'l Corp. v. OSHA,* 656

F.2d 925, 932 (4th Cir.1981); *Bonney Motor Express, Inc. v. United States,* 640 F.2d 646, 650 (5th Cir.1981); *Spartan Radiocasting Co. v. FCC,* 619 F.2d 314, 321–22 (4th Cir.1980); *Consolidation Coal Co. v. Costle,* 604 F.2d 239, 248–49 (4th Cir.1979), *rev'd on other grounds sub nom. EPA v. National Crushed Stone Ass'n,* 449 U.S. 64, 101 S.Ct. 295, 66 L.Ed.2d 268 (1980).

5. *South Terminal Corp. v. EPA,* 504 F.2d 646, 659 (1st Cir.1974); *see also AFL–CIO v. Donovan,* 757 F.2d 330, 338 (D.C.Cir.1985); *Chocolate Mfrs. Ass'n v. Block,* 755 F.2d 1098, 1105 (4th Cir.1985).

6. *See Pennzoil Co. v. FERC,* 645 F.2d 360, 372 (5th Cir.1981) (agency's *reversal of position* on contested issue "demonstrates not that the agency acted arbitrarily, but simply that the administrative process was working.... [M]odification of proposed rules in light of written and oral presentations is the heart of the rulemaking process."), *cert. denied,* 454 U.S. 1142, 102 S.Ct. 1000, 71 L.Ed.2d 293 (1982).

rule it proposed, partly at least in response to submissions.... A contrary rule would lead to the absurdity that in rulemaking under the APA the agency can learn from the comments on its proposals only at the peril of starting a new procedural round of commentary.

*International Harvester Co. v. Ruckelshaus*, 478 F.2d 615, 632 & n. 51 (D.C.Cir. 1973).[7]

Of course, in this context the enunciation of general legal principles is not especially helpful. The adequacy of notice in any case must be determined by a close examination of the facts of the particular proceeding which produced a challenged rule. However, without reciting in detail the facts of other cases, we note that courts have upheld final rules which differed from proposals in the following significant respects: outright reversal of the agency's initial position; elimination of compliance options contained in an NPR; collapsing, or further subdividing, distinct categories of regulated entities established in a proposed rule; exempting certain entities from the coverage of final rules; or altering the method of calculating or measuring a quantity relevant to a party's obligations under the rule.[8]

On the other hand, a rule will be invalidated if no notice was given of an issue addressed by the final rules. Moreover, courts have held on numerous occasions that notice is inadequate where an issue was only addressed in the most general terms in the initial proposal, or where a final rule changes a pre-existing agency practice which was only mentioned in an NPR in order to place unrelated changes in the overall regulatory scheme into their proper context.[9]

■ The crucial issue, then, is whether parties affected by a final rule were put on notice that "their interests [were] 'at stake' "; [10] in other words, the relevant inquiry is whether or not potential commentators would have known that an issue in which they were interested was "on the table" and was to be addressed by a final rule. From this perspective it is irrelevant whether the proposal contained in the NPR was favorable to a particular party's interests; the obligation to comment is not limited to those *adversely* affected by a proposal. "[A]pproval of a practice in a proposed rule may properly alert interested parties that the practice may be disapproved in the final rule in the event of adverse com-

**7.** Other courts have also stressed that section 553 should not be construed to place administrative agencies in the dilemma of either ignoring comments (in which case a final rule may be invalidated due to the agency's intransigence) or modifying its proposals in response to comments, thus triggering another round of notice and commentary. *See, e.g., Trans–Pacific Freight Conference v. Federal Maritime Comm'n*, 650 F.2d 1235, 1249 (D.C.Cir.1980) (Wilkey, J.), *cert. denied*, 451 U.S. 984, 101 S.Ct. 2315, 68 L.Ed.2d 840 (1981); *South Terminal Corp. v. EPA*, 504 F.2d 646, 659 (1st Cir.1974).

**8.** *See, e.g., Natural Resources Defense Council v. EPA*, 824 F.2d 1258, 1283–84 (1st Cir.1987); *American Transfer & Storage Co. v. ICC*, 719 F.2d 1283, 1303 (5th Cir.1983); *Small Refiner Lead Phase–Down Task Force v. EPA*, 705 F.2d 506, 547–48 (D.C.Cir.1983); *Connecticut Light & Power Co. v. NRC*, 673 F.2d 525, 532–34 (D.C. Cir.), *cert. denied*, 459 U.S. 835, 103 S.Ct. 79, 74 L.Ed.2d 76 (1982); *Daniel Int'l Corp. v. OSHA*, 656 F.2d 925, 931–32 (4th Cir.1981); *Pennzoil Co. v. FERC*, 645 F.2d 360, 371–72 (5th Cir. 1981), *cert. denied*, 454 U.S. 1142, 102 S.Ct. 1000, 71 L.Ed.2d 293 (1982); *Consolidation Coal Co. v. Costle*, 604 F.2d 239, 246–49 (4th Cir.1979), *rev'd*

on other grounds sub nom. *EPA v. National Crushed Stone Ass'n*, 449 U.S. 64, 101 S.Ct. 295, 66 L.Ed.2d 268 (1980); *BASF Wyandotte Corp. v. Costle*, 598 F.2d 637, 642–44 (1st Cir.1979), *cert. denied sub nom. Eli Lilly & Co. v. Costle*, 444 U.S. 1096, 100 S.Ct. 1063, 62 L.Ed.2d 784 (1980); *American Iron & Steel Inst. v. EPA*, 568 F.2d 284, 293–94 (3d Cir.1977); *South Terminal Corp. v. EPA*, 504 F.2d 646, 658–59 (1st Cir.1974); *Abington Memorial Hosp. v. Heckler*, 576 F.Supp. 1081, 1085 (E.D.Pa.1983), *district court's opinion adopted*, 750 F.2d 242, 243 (3d Cir.1984), *cert. denied*, 474 U.S. 863, 106 S.Ct. 180, 88 L.Ed.2d 149 (1985).

**9.** *AFL–CIO v. Donovan*, 757 F.2d 330, 339 (D.C. Cir.1985); *Chocolate Mfrs. Ass'n v. Block*, 755 F.2d 1098, 1106 (4th Cir.1985); *Small Refiner Lead Phase–Down Task Force v. EPA*, 705 F.2d 506, 548–49 (D.C.Cir.1983); *Kollett v. Harris*, 619 F.2d 134, 144 & n. 13 (1st Cir.1980); *American Standard, Inc. v. United States*, 220 Ct.Cl. 411, 602 F.2d 256, 267–69 (1979); *id.*, 602 F.2d at 269 (Nichols, J., concurring).

**10.** *Spartan Radiocasting Co. v. FCC*, 619 F.2d 314, 321 (4th Cir.1980) (quoting *South Terminal Corp. v. EPA*, 504 F.2d 646, 659 (1st Cir. 1974)).

ments." [11] Even a favorable proposal should notify an interested party that a particular issue has been opened for discussion. The publication of a *proposed* rule does not forever bind the agency to the approach contained in the NPR; if interested parties favor a particular regulatory proposal, they should intervene in the rulemaking to support the approach an agency has tentatively advanced.

Judged by these standards, it is clear that the AMA received adequate notice of the IRS's proposed regulations on the allocation of membership dues to circulation income. The approach finally adopted by the IRS, while substantially different from the NPR, was a "logical outgrowth" of the original proposal. The final rule dealt with the identical issue of dues allocation, merely altering the allocation regime to assure greater consistency and fairness. The allocation rules finally adopted were not a wholly new approach to the issue of dues allocation. Instead the final rule was "contained" in the proposed version, and merely eliminated some of the alternative calculation methods specified in the NPR. Thus all aspects of the final rule were available to the public for comment. Moreover, the possibility that membership dues might be imputed in part to a tax-exempt organization's periodicals was an issue which had not previously been addressed by IRS regulations or established practice. The NPR for the first time dealt with an issue of great importance to organizations like the AMA. All such organizations must have recognized that the IRS was writing on a clean slate; the AMA cannot argue that it relied on established past practice as a justification for its non-participation. The AMA's sole explanation for its failure to comment is that the rule as initially proposed looked fine to it, and therefore the association saw no need to intervene in the rulemaking. But as we have seen, an agency's proposed rule is merely that, a proposal. While an agency must explain

and justify its departures from a proposed rule, it is not straitjacketed into the approach initially suggested on pain of triggering a further round of notice-and-comment. The AMA was given a meaningful opportunity to comment on the IRS's dues allocation rules, and those rules will not be invalidated for lack of proper notice.

### III.

The AMA also contends that the allocation rules are inconsistent with the Code sections governing the unrelated business income tax. The regulations establish a dichotomy between "direct advertising costs" and "readership costs"; readership costs (those expenses associated with the production and distribution of the editorial content of a periodical) are not fully deductible from advertising income. The AMA argues that the readership content of its journals contributes to the production of advertising revenue; to the extent the regulations prohibit the deduction of readership costs directly from advertising income, they are inconsistent with the statutory mandate that expenses "directly connected with" an unrelated business should be fully deductible. *See* § 512(a)(1). The AMA also contends that the allocation rules are invalid because they ignore competitive factors in allocating membership receipts to circulation income. According to the AMA the overriding purpose of the unrelated business income tax was to equalize competition between taxable and tax-exempt entities operating similar enterprises; to the extent the regulations prohibit the AMA from demonstrating that the subscription price charged by its competitors is lower than the result of the pro rata allocation method, the regulations impermissibly depart from the "competition-equalizing" purpose of the statute.

At the outset we note that the Supreme Court has indicated that courts should generally defer to the IRS's inter-

---

**11.** *Chocolate Mfrs. Ass'n v. Block,* 755 F.2d 1098, 1107 (4th Cir.1985); *see also Association of Am. Railroads v. Adams,* 485 F.Supp. 1077, 1085 (D.D.C.1978) ("Essentially, the [petitioner] asserts the right of a party agreeing with an agen-

cy's initial proposal to refrain from commenting thereon and then to insist that the proposed rule not be changed to its detriment. The Court feels compelled to reject this position.").

pretation of the Internal Revenue Code in regulations meant to implement the Code's provisions. Treasury regulations " ' "must be sustained unless unreasonable and plainly inconsistent with the revenue statutes," and "should not be overruled except for weighty reasons." ' " [12] "The choice among reasonable interpretations is for the Commissioner, not the courts." *National Muffler Dealers Ass'n, Inc. v. United States,* 440 U.S. 472, 488, 99 S.Ct. 1304, 1312, 59 L.Ed.2d 519 (1979); *Chevron USA Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984).

■ The regulations related to the deductibility of a periodical's expenses generally parrot the statutory language. The statute states that expenses are fully deductible from taxable income if they are "directly connected with" the conduct of the unrelated business; the regulation similarly provides that "direct advertising costs," which are fully deductible, are those costs which are "directly connected with the sale and publication of advertising." Reg. 1.512(a)–1(f)(6)(ii)(a). So far, there would not appear to be any problem.

However, the regulation goes on to state that "readership costs," (those costs which are "directly connected with the production and distribution of the readership content of the periodical"), are *only* deductible from advertising revenues to the extent that those costs exceed circulation income; *i.e.,* only to the extent that the editorial side of the journal produces a "loss." Reg. 1.512(a)–1(d)(2), (f)(1).[13] These are the provisions with which the AMA vigorously dis-

agrees. For as the AMA sees things, the readership content of a journal contributes to its publisher's ability to sell advertising—a journal with high-quality articles is presumably more widely read and advertisers are accordingly more likely to place ads for their products in such a periodical. By failing to take account of the symbiotic relationship between advertising and editorial content, the regulation impermissibly fails to allow the deduction of costs which are in reality "directly connected with" the sale and publication of advertising.

While the AMA's argument is perhaps minimally plausible, we do not believe the AMA has carried the heavy burden of demonstrating that the IRS's contrary approach is "plainly inconsistent" with the tax code. First, we note that the AMA's position here is somewhat ironic—the AMA has been accorded a tax exemption for the readership content of its journals because the publication of a periodical furthers the organization's charitable purposes by disseminating knowledge to its members. The AMA (and many other tax-exempt organizations) initially argued that even the *advertising* revenue of its periodicals was tax exempt, because the advertising subsidized the readership content of the journal and thereby contributed to the organization's exempt purposes. That position was ultimately defeated by the addition of section 513(c) to the Code, and the decision in *United States v. American College of Physicians,* 475 U.S. 834, 106 S.Ct. 1591, 89 L.Ed.2d 841 (1986). The AMA now essentially reverses its position, portraying its journals as, in large part, vehicles for ad-

**12.** *Thor Power Tool Co. v. Commissioner,* 439 U.S. 522, 533, 99 S.Ct. 773, 781, 58 L.Ed.2d 785 (1979) (quoting *Bingler v. Johnson,* 394 U.S. 741, 750, 89 S.Ct. 1439, 1445, 22 L.Ed.2d 695 (1969) (quoting *Commissioner v. South Texas Lumber Co.,* 333 U.S. 496, 501, 68 S.Ct. 695, 698, 92 L.Ed. 831 (1948))); *see also United States v. Vogel Fertilizer Co.,* 455 U.S. 16, 24–26 (1982); *National Muffler Dealers Ass'n, Inc. v. United States,* 440 U.S. 472, 476, 99 S.Ct. 1304, 1306, 59 L.Ed.2d 519 (1979) (IRS's regulations, " 'if found to "implement the congressional mandate in some reasonable manner," must be upheld' ") (quoting *United States v. Cartwright,* 411 U.S. 546, 550, 93 S.Ct. 1713, 1716, 36 L.Ed.2d 528 (1973) (quoting *United States v. Correll,* 389 U.S.

299, 307, 88 S.Ct. 445, 449, 19 L.Ed.2d 537 (1967))); *Fulman v. United States,* 434 U.S. 528, 533, 98 S.Ct. 841, 845, 55 L.Ed.2d 1 (1978); *Water Quality Ass'n Employees' Benefit Corp. v. United States,* 795 F.2d 1303, 1305–06 (7th Cir. 1986).

**13.** The definition of fully deductible advertising costs specifically *excludes* "items of deduction attributable to the production or distribution of the readership content of the periodical." Reg. 1.512(a)–1(f)(6)(ii)(a). Thus it is clear that the regulations generally do not contemplate the direct deduction of readership costs from advertising income.

vertising, and seeks to have a portion of editorial costs deducted directly from taxable advertising income.

Certainly, the AMA makes a valid point that the editorial content of its journals contributes in some manner to the success of the advertising business. Presumably few AMA members would read, and therefore few advertisers would advertise in, a journal which was one-hundred percent advertising. However, it is entirely plausible to label this general benefit which the articles confer on the advertising "indirect" (and therefore not fully deductible from advertising revenue), especially when advertising is viewed (as it must be under the "fragmentation" principle, *see* section 513(c) of the Code) as a separate and independent enterprise. The costs of producing the readership content of the AMA's journals is most directly connected with the editorial "business" of the journals; these costs are attributable only indirectly to the other business (advertising) which the AMA also conducts within the confines of a single periodical. *See* Reg. 1.512(a)–1(a) ("to be 'directly connected with' the conduct of unrelated business for purposes of section 512, an item of deduction must have proximate and primary relationship to the carrying on of that business"). If two businesses occupy a single building, and one business increases its sales volume, thereby increasing the customer traffic through the common building, benefitting the second, independent enterprise, we would without hesitation label the effect on the latter business "indirect." The situation of the AMA's publications is identical—the AMA essentially carries on two separate businesses "under the same roof"; when one business does well and increases the allure of the building as a whole to customers, the effect on the second business is "indirect" and therefore the first enterprise's expenses are not immediately deductible from the latter's income. It is certainly reasonable for the IRS to have concluded that, in general, "readership costs" of the AMA's periodicals are not "directly connected with" the conduct of the AMA's advertising business.

The AMA argues that the Second Circuit's decision in *Rensselaer Polytechnic Institute v. Commissioner*, 732 F.2d 1058 (1984), requires that the AMA be allowed to deduct some portion of readership costs from advertising income. *Rensselaer* involved a fieldhouse operated by a tax-exempt educational institution. The fieldhouse was used for both tax-exempt, student events (*e.g.*, college athletics), and for commercial functions, such as commercial ice shows. The staging of commercial events at the fieldhouse constituted an "unrelated business." The allocation question before the Second Circuit involved certain "fixed costs" of operating the structure—repairs, depreciation, salaries of fieldhouse personnel, etc. The court held that those fixed expenses should be allocated to the school's tax-exempt and taxable businesses based on the number of hours for which the fieldhouse was used for each activity, since the fixed costs were attributable to both student and commercial events. *Id.* at 1061–62; *see also Disabled Am. Veterans v. United States*, 704 F.2d 1570, 1573–74 (Fed.Cir.1983).

*Rensselaer* is distinguishable from this case. *Rensselaer* involved the cost of goods or services which actually benefited both the tax-exempt function and the unrelated trade or business. *Rensselaer* would control the present case if the AMA wished to apportion the costs of a printing press, paper stock or employees used in both the editorial and advertising businesses based on the extent to which each business employed the common resource. Such an apportionment would clearly be proper, since the expense benefited both activities in some measure.

But *Rensselaer* does not address the independent question whether, assuming costs are directly tied to only one activity, those costs may *still* be deductible from the other activity, because the activities themselves benefit each other in some undefined fashion. In *Rensselaer* the school did not argue that a portion of the costs of its student functions should be deducted from its taxable income because staging student events promoted commercial leasing by demonstrating to the entertainment

industry that the fieldhouse was an attractive venue fully capable of handling major events. (As a factual matter, such an argument might well be accurate—commercial promoters would doubtless be hesitant to stage a major entertainment event in a stadium which was seldom used, and with which the local audience was unfamiliar.) We have no doubt that, if such an argument *had* been presented, the Second Circuit would have rejected it for the same reasons we reject the AMA's argument here—while one activity may benefit the other in some generalized way, that beneficial effect is more properly viewed as only "indirectly connected" to the benefited business.

The AMA also contends that the regulations are invalid because they ignore the situation of the AMA's taxable competitors in determining the portion of membership dues receipts to be allocated to circulation income. The AMA argues that the approach of the regulations is inconsistent with the fundamental purpose of the unrelated business income tax, which was to equalize competition between taxable and tax-exempt organizations plying the same trade. The AMA argues that this "competition-equalizing" goal can be attained only by placing the AMA's journals on the "same [*i.e.*, identical] tax basis" as its commercial competitors. The simple answer to this argument is that, although the equalization of competition was indeed a major goal of the unrelated business tax, Congress never intended to place tax-exempt organizations on a tax basis identical to that of their commercial competitors. Congress instead endorsed the "fragmentation" principle, whereby a charity's periodicals are divided into two components. In light of Congress' adoption of the "fragmentation" concept, it is not possible to place the AMA's journals on an identical footing with competing publications. Taxable publications labor under no "fragmentation" requirement; there is no need for a taxable publisher to segregate its income or expenses into components, some taxed, others not. A commercial publisher is taxed on all aspects of its business. Therefore, although it is certainly instructive to recall the purposes underlying the enactment of the unrelated business income tax, direct analogies to the tax treatment of commercial publishers are of limited assistance in deciding specific allocation questions involving tax-exempt organizations.

Moreover, while the equalization of competition between taxable and tax-exempt entities was a major goal of the unrelated business income tax, it was by no means the statute's sole objective. As the Fifth Circuit concluded after conducting a detailed examination of the legislative history of the unrelated business income tax, "although Congress enacted the predecessors of section 511–513 to eliminate a perceived form of unfair competition, that aim existed as a corollary to the larger goals of producing revenue and achieving equity in the tax system." *Louisiana Credit Union League v. United States*, 693 F.2d 525, 540 (5th Cir.1982); *see also Rensselaer*, 732 F.2d at 1063–64 & n. 2 (Mansfield, J., dissenting). This interpretation of the unrelated business income tax should not be constrained by a narrow focus on only one of several objects which motivated Congress to enact the tax.

We will not second-guess the IRS's decision to eliminate from its proposed rules the allocation method using as a benchmark periodicals of comparable *taxable* enterprises in computing the portion, if any, of a charitable organization's membership dues to be considered an implicit subscription payment. The IRS could reasonably conclude that the efforts required to attempt to determine whether another publication was "comparable" were not worthwhile. This is true especially if, as in the final rule here, allocable membership receipts could be determined using factors internal to the charity, such as the relation of periodical costs to the cost of all exempt activities. Although the AMA's alternative allocation approach is *also* reasonable (and in fact was included in the IRS's initial proposal), it is for the IRS to choose among a number of rational approaches to a difficult question of income measurement. We therefore conclude that the IRS regulations governing the allocation of membership

dues to circulation income are not inconsistent with the relevant provisions of the Internal Revenue Code.

## IV.

■ The AMA argues that membership dues which it placed in an "association equity" account should not have been counted as current membership receipts in order to determine the amount of membership dues which should be considered a member's payment for the right to receive the AMA's periodicals. The amounts paid into the association equity account were not used to meet the AMA's expenses in the tax years in question, but were instead employed as a reserve fund to meet possible future operating deficits. The parties stipulated that the amounts placed in this reserve were in fact not employed by the AMA to compensate for revenue shortfalls until the 1985 tax year.

The IRS regulation outlining the "pro rata allocation method" for membership dues states that this method for determining an imputed subscription price for a charity's publications rests on the assumption "that membership receipts and gross advertising income are equally available for all of the exempt activities (including the periodical) of the organization." Reg. 1.512(a)–1(f)(4)(iii). Where membership receipts are not employed to meet current expenses (and are not, in fact, even "available" to pay current expenses due to a self-imposed restriction on the use of the funds), the AMA contends that the explicit premise of the pro rata allocation method does not apply, and therefore that portion of dues which is set aside to meet future expenses must be excluded from the pro rata calculation. The district court accepted this argument. 668 F.Supp. at 1096–97.

We cannot agree with the AMA's argument. The fundamental premise of regulation (f)(4)(iii) is that the activities of a charitable organization produce revenue in the same proportion that the costs of those activities bear to one another. But the regulation does *not* necessarily assume that all membership receipts are actually expended to meet activity costs; instead, it is entirely consistent with the regulation to find that the activities of an exempt organization produce a "profit," in the sense that those activities produce revenues in excess of their costs. All the regulation assumes is that, if the organization in fact reaps a "profit" from its activities, that profit was produced by all of the association's activities in equal measure (*i.e.*, the "profit margin" of each activity is assumed to be the same). Members need not believe they are receiving the benefits of membership "at cost"; it is perfectly rational to assume that members realize they are paying more for services than those services cost the organization to provide. Therefore, although the AMA's revenues exceeded the costs of its operations, and the surplus was placed in a "rainy-day fund," this does not mean that, when members paid their annual dues, they were not paying for the various benefits of membership in proportion to what those activities cost the association to provide. It is perfectly rational for regulation (f)(4)(iii) to assume that members pay for services in the same proportion as the cost of those services to the organization, even if revenues in fact exceed expenses.

The AMA also suggests that the excess dues placed in the "association equity" account should be likened to capital contributions. The problem with this argument is that the AMA's members received nothing in return for their "investment" in the AMA other than the right to receive the benefits of membership in the single annual period for which dues were assessed. In exchange for a capital contribution the contributor receives a future or residual claim, for example, for return of capital as dividends or as the proceeds of liquidation. A capital contribution is in the nature of an investment whereby the investor purchases a continuing interest in an enterprise.[14] In

---

14. *See, e.g., Commissioner v. Fink,* 483 U.S. 89, 97, 107 S.Ct. 2729, 2734, 97 L.Ed.2d 74 (1987) (contributors must intend "to protect or increase the value of their investment in the corporation"); *In the Matter of Larson,* 862 F.2d 112, 117 (7th Cir.1988) (capital contribution characterized by fact that investor expects to

this case there is no evidence that AMA members received anything more for their annual membership fee than an annual membership; they received no claim of future benefit.

We have found only one reported decision which is even remotely similar to the present case. In *Washington Athletic Club v. United States*, 614 F.2d 670 (9th Cir.1980), a non-profit membership organization established a "capital improvement fund" to finance various construction projects intended to expand the services provided by the club. Members were assessed a surcharge, payable as part of their annual dues, which was placed in the club's improvement fund. The funds contained in the capital improvement account were not used to meet current operating expenses. Nevertheless the court held that the monies paid by members into the capital improvement fund were current income of the organization, *not* tax-exempt capital contributions. The court noted that members were required to pay the surcharge in order to enjoy the club's facilities in the current period, and that payment of the surcharge did not confer any continuing benefit on members after the close of the year for which dues were paid. *Id.* at 675. Nor were a member's contributions to the capital improvement account cumulative; a member who had paid into the capital improvement account for a number of years was in no better position than a member who paid into the account only once. *Id.* Since members received no benefit through

payment of the surcharge other than the rights attendant to an annual membership in the club, the members lacked an "investment motive" in making the payments, and therefore treatment of the monies received as a capital contribution was inappropriate. *Id.*

The reasoning of *Washington Athletic Club* is persuasive, and directly applicable here. The AMA's members received no continuing benefit from their payments into the association equity account; the sum paid as an annual membership fee entitled the member only to the benefits of membership in the year of payment. Therefore the funds placed in the association equity account were current "income" of the AMA, and should be allocated as revenue to the AMA's various activities in accordance with the pro rata allocation method.[15]

In essence the AMA's argument concerning membership dues placed in a reserve account presents a question of income realization. The AMA argues, in effect, that it should not be required to recognize income in the current tax year where it has set aside the monies received to meet future expenses. But this is contrary to the general rule that income must be recognized when the recipient has the unrestricted right to use the funds. This is true even though the income recipient may incur future expenses performing the services currently paid for, or may, in the future, be required to refund the money.[16] A taxpay-

recoup her investment, hopefully with a profit, in the event the corporation is successful).

**15.** If the AMA were consistent in its view that monies placed in the association equity account should be likened to capital contributions, it would argue that those monies should *never* be considered income, even when later expended to cure an operating deficit. However, the AMA has conceded that the association equity funds would be treated as income when actually employed to pay current expenses of the organization.

**16.** Under the "claim of right" doctrine a taxpayer must recognize as current income money received over which the taxpayer exercises unrestricted control, unless the taxpayer is "under an unequivocal ... duty to repay it, so that he is really just the custodian of the money." *Illinois*

*Power Co. v. Commissioner*, 792 F.2d 683, 689 (7th Cir.1986); *see also United States v. Lewis*, 340 U.S. 590, 71 S.Ct. 522, 95 L.Ed. 560 (1951); *North Am. Oil Co. v. Burnet*, 286 U.S. 417, 424, 52 S.Ct. 613, 615, 76 L.Ed. 1197 (1932) (Brandeis, J.) ("If a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income which he is required to [pay tax on], even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent."). Relying on this principle courts have generally held that a public utility must recognize a security deposit as an "advance payment of income," and thus currently taxable, if the utility has the unrestricted use of the money, is not required to pay full market-rate interest on the funds and the deposit is intended to secure the payment of

er may not defer the recognition of income (or, what is virtually the same thing, anticipate a future expense), by unilaterally establishing reserve accounts to meet contingent liabilities.[17] Of course, if "all the events" necessary to establish the taxpayer's future liability have already occurred, or the taxpayer has assumed a definite obligation to provide services beyond the current tax year, the current deduction of a future expense, or the deferral of income recognition, may be allowed.[18] But the AMA does not argue that its future liabilities were certain in the tax years in question, nor did the AMA incur any liability to provide services to current members in future years. Therefore there is no justification for allowing the AMA to defer income recognition until the years in which the association equity account was actually drawn down to meet current expenses.[19]

## V.

■ The AMA distributes a substantial number of copies of both JAMA and AM News free of charge. This "controlled circulation" is specifically directed at physicians who constitute an especially attractive audience for persons likely to advertise in the journals. The parties stipulated that the sole purpose behind the AMA's controlled circulation was to appeal to advertisers. The AMA now contends, and the district court found, that the costs of producing the editorial content of the copies of the journals sent to control group members should be considered "direct advertising costs," fully deductible from advertising revenue. According to the AMA and the district court, an item of expense is "directly connected with" the AMA's advertising activities if the "costs are incurred *solely* for the purpose of increasing advertising revenues." 668 F.Supp. at 1095 (emphasis in original).

The IRS's regulations define "direct advertising costs" to exclude "items of deduction attributable to the production or distribution of the readership content of the

---

the customer's utility bill, and therefore may never be refunded if the customer's payments are delinquent. *Indianapolis Power & Light Co. v. Commissioner,* 857 F.2d 1162 (7th Cir.1988); *City Gas Co. of Fla. v. Commissioner,* 689 F.2d 943 (11th Cir.1982).

17. *Brown v. Helvering,* 291 U.S. 193, 54 S.Ct. 356, 78 L.Ed. 725 (1934) (Brandeis, J.) (taxpayer must recognize as current income amounts placed in reserve account to meet contingent future liabilities).

18. Regarding the current deductibility of an expense to be paid in the future where "all the events" necessary to establish liability have occurred during the tax year, *see generally United States v. General Dynamics Corp.,* 481 U.S. 239, 242–46, 107 S.Ct. 1732, 1735–37, 95 L.Ed.2d 226 (1987), and cases cited therein. Even where money currently paid is intended as a prepayment for services to be performed in future years, the courts have allowed income recognition to be deferred in only limited circumstances. Thus, where future services will be performed at random times over the term of a service contract, rather than equally in each time period, the courts have generally required that the taxpayer recognize current income in the entire amount of the payment received. *Schlude v. Commissioner,* 372 U.S. 128, 83 S.Ct. 601, 9 L.Ed.2d 633 (1963); *American Auto. Ass'n v. United States,* 367 U.S. 687, 81 S.Ct. 1727, 6 L.Ed.2d 1109 (1961); *Automobile Club of Mich. v. Commissioner,* 353 U.S. 180, 77 S.Ct. 707, 1

L.Ed.2d 746 (1957); *RCA Corp. v. United States,* 664 F.2d 881, 886–89 (2d Cir.1981), *cert. denied,* 457 U.S. 1133, 102 S.Ct. 2958, 73 L.Ed.2d 1349 (1982). For a general discussion of the current tax consequences of contingent future events, and the relationship between tax accounting and generally accepted financial accounting principles, *see Thor Power Tool Co. v. Commissioner,* 439 U.S. 522, 541–44, 99 S.Ct. 773, 780, 58 L.Ed.2d 785 (1979).

19. In many respects the IRS's refusal to give effect to the AMA's association equity account as a valid means to defer income recognition is functionally identical to the judgment under section 446 of the Code that a taxpayer's accounting method "does [not] clearly reflect income." The Supreme Court has stressed that the Commissioner has been accorded a great deal of discretion in assessing the accuracy of a taxpayer's method of accounting; the IRS's determination in this regard "should not be interfered with unless clearly unlawful." *Lucas v. American Code Co.,* 280 U.S. 445, 449, 50 S.Ct. 202, 203, 74 L.Ed. 538 (1930); *see also United States v. Hughes Properties, Inc.,* 476 U.S. 593, 603, 106 S.Ct. 2092, 2097, 90 L.Ed.2d 569 (1986); *Thor Power Tool Co. v. Commissioner,* 439 U.S. 522, 532, 99 S.Ct. 773, 780, 58 L.Ed.2d 785 (1979). This consideration suggests yet another reason why we should be reluctant to invalidate the IRS's determination that funds assigned to the association equity account constitute current "income" of the AMA.

periodical." Reg. 1.512(a)–1(f)(6)(ii)(a). The IRS argues that these regulations adopt a purely objective standard for determining the nature of an expense—if the expense is related to the production or distribution of the journal's articles, it is a "readership cost" deductible from advertising income only if circulation income is negative; if the expense is proximately related to production or distribution of advertising it is a "direct advertising cost" and fully deductible from advertising revenue. Under the Government's reading of the regulations the subjective intent of the publisher in incurring any particular expense is irrelevant to the categorization of the expense as a readership or advertising cost. Thus, the expenses associated with the production of the readership content of copies of the AMA's journals distributed to control group members would be deductible directly from circulation income only, despite the fact that the AMA's motivation in producing and distributing these copies of the journals was *solely* to promote its advertising business.

We believe that the IRS has adopted an overly restrictive construction of its regulations. Although the regulations define readership costs as any cost "attributable to" the production or distribution of articles in a tax-exempt organization's journals, the rules need not be read to limit the deductibility of the cost of producing articles where such costs are motivated *solely* by an intent to increase advertising revenues. Where the clearly dominant motivation of a given expenditure is to contribute to the taxable, unrelated enterprise, that cost is "directly connected with" the taxable enterprise and therefore deductible in its entirety from the income of the unrelated trade or business.

Under the regulations, an expense is "directly connected with" an unrelated trade or business where the item of deduction "ha[s] [a] proximate and primary relationship to the carrying on of that business." Reg. 1.512(a)–1(a). The required connection between an expense and the unrelated business is similar to the nexus required to support the deduction of a business expense or bad debt. *Rensselaer Polytech-*

*nic Inst. v. Commissioner,* 732 F.2d 1058, 1062 (2d Cir.1984). And the general rule is that an item of expense is deductible as a "business" expense or bad debt if "the dominant motivation" of the taxpayer in incurring the expense was to further the particular business enterprise. *See United States v. Generes,* 405 U.S. 93, 103–05, 92 S.Ct. 827, 833–34, 31 L.Ed.2d 62 (1972); *Whipple v. Commissioner,* 373 U.S. 193, 204, 83 S.Ct. 1168, 1175, 10 L.Ed.2d 288 (1963). We see no reason to adopt a different rule in determining whether a tax-exempt organization's expenditures are "directly connected with" an unrelated trade or business. If the dominant motivation of an expenditure is to further the unrelated business, it should be fully deductible from the income of that business.

The Supreme Court's decision in the *American College* case provides further support for an intent-based standard for deductibility of publication expenses. The Court held in *American College* that the determination whether advertising in exempt organization periodicals is in fact a taxable, "unrelated" business must depend on the facts and circumstances of a particular advertising program. 475 U.S. at 847–50, 106 S.Ct. at 1598–1600. The Court specifically rejected the government's argument that advertising was *per se* "unrelated" to a charity's purposes and therefore always taxable. In similar fashion, we reject the Government's advocacy of a *per se* rule that the cost of producing articles can *never* be a direct advertising cost, even where it is undisputed that the expense was incurred only to promote a charity's advertising business.

This holding is not inconsistent with our earlier ruling that the IRS's regulations are generally consistent with the governing provisions of the tax code. In that context, we rejected the AMA's broad argument that the editorial content of a journal directly produces advertising revenue simply because of the relationship of advertising and articles in a single publication. However, while the regulations are on sound ground in prohibiting as a general rule the full deductibility of readership expenses, in

certain circumstances such costs are part of the journal's advertising enterprise. This is true where it is absolutely clear that the costs would not have been incurred but for the journal's efforts to promote its advertising business. Where the dominant motivation of a readership expense is demonstrably to increase advertising revenues, that expense is deductible as a "direct advertising cost." We therefore affirm the district court's judgment that the costs of producing articles in copies of the AMA's journals distributed free of charge as part of the AMA's controlled circulation are fully deductible "direct advertising costs."

## VI.

■ Finally the AMA argues that membership dues should not be allocated to circulation income where the dues-paying AMA member was entitled to receive complimentary copies of JAMA and AM News through the AMA's "controlled circulation." The AMA argues, in essence, that these physicians should not be deemed to have paid for a periodical (through a portion of their membership dues) which they were entitled to receive free of charge. Regulation (f)(3), which states that dues will be allocated to circulation income if the "right to receive" the periodical "is associated with membership," should be read to embody a "notion of exclusivity." We take it this "notion of exclusivity" would mean that a portion of dues should be attributed to circulation income only if the member receives the periodical *solely because of his membership* in the organization. The AMA also relies on Regulation (f)(3)'s statement that, in general, membership receipts allocated to circulation income should approximate the price that would be paid in a comparable arms-length transaction. Thus, in the AMA's eyes, "the central issue [is] whether a commercial publisher would distribute JAMA and AM News free of charge" to physicians in the control group who are also dues-paying AMA members.

We believe that the AMA fundamentally misstates the issue. If we are to rely on analogies to hypothetical arms-length transactions by taxable publishers, the relevant analogy would be to a commercial publisher who receives paid subscriptions from physicians otherwise entitled to receive the periodical free. The physicians had no idea they were entitled to complimentary subscriptions. And our hypothetical publisher ("laughing all the way to the bank," as the saying goes) retains the money paid by the unknowing physicians, meanwhile purging their names from the controlled circulation list (to insure that the doctors do not receive two copies of the journal). Is the money received by the taxable publisher income? Of course it is. Although our over-generous physicians paid more for the journal than they needed to, this does not change the basic fact—they *did* pay for the journal, and the publisher was only too happy to keep the unnecessary payment. The situation might be different if the publisher returned the subscription payment to the physicians, explaining that payment was unnecessary—but there is no indication that the AMA informed the relevant group of physicians to put their money to better use.

Adoption of the AMA's position would also produce the anomaly that these control group/AMA members would have paid *more* for the AMA's *other* services than noncontrol group AMA members. The AMA now argues that these physicians, schooled in the ways of medical journals, *must have* known that AMA membership was unnecessary if the periodicals were all they wanted, and therefore *must have* intended their dues payments to apply only to the AMA's other activities. However as Judge Shadur observed, "[n]othing [in the record] is offered to support that ipse dixit." 668 F.Supp. at 1098 n. 22. Since the burden of proof is on the AMA in this refund action, this lack of record evidence is fatal to the AMA's contentions regarding its members' motivations in paying dues. We therefore affirm the district court's conclusion that dues from members who were also in the control group should be allocated to circulation income to the same extent as the dues of other AMA members.

## VII.

For the foregoing reasons the judgment of the district court is

AFFIRMED IN PART AND REVERSED IN PART.